**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,**

**v.**

**Ellis ARMSTRONG, Commissioner, Bureau of Reclamation, et al., Defendants.**

**No. C–72–1057.**

United States District Court, N. D. California.

Nov. 14, 1972.

Michael Palmer, Environmental Defense Fund, Inc., Berkeley, Cal., for plaintiffs.

James Browning, Jr., U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., for defendants.

RENFREW, District Judge.

This action arises under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (hereinafter NEPA), which requires the filing of an Environmental Impact Statement in connection with any proposed "major Federal action" which will significantly affect the quality of the human environment. The proposed action concerns a public works project known as the New Melones Dam, a 625-foot high structure across the Stanislaus River to impound 2.4 million acre feet of water. When completed, the New Melones Dam will be the second largest earth and rock-filled dam in the country. The project was authorized by Congress under the Flood Control Act of 1944, 58 Stat. 887, and re-authorized by the Flood Control Act of 1962, 76 Stat. 1173. The dam is to be completed in 1978 under the direction of the United States Army Corps of Engineers, and operated thereafter by the United States Bureau of Reclamation and the County Flood Control Associations. An Environmental Impact Statement (hereinafter EIS) was prepared by the United States Army Engineer District, Sacramento, California, in May of 1972 and revised effective June 21, 1972.

Under the original construction schedule, the main dam contract, a project valued at between 60 and 80 million dollars, including the main dam and appurtenances, was to be opened for bidding on October 10, 1972. The contract was then scheduled to be awarded on October 20th, with work commencing, pos-

sibly, as soon as October 30th, ten days after the award.

Plaintiffs brought this action on June 8, 1972, seeking preliminarily to enjoin further work on the dam. Numerous party-intervenors were admitted on both sides. Finally, the hearings on the motion for a preliminary injunction and the trial on the merits were consolidated. The Court then heard testimony from Wednesday, September 27, through Saturday, September 30, 1972. At the conclusion of the presentation of evidence, a lengthy session was held in chambers on Saturday night, September 30th. At that time the Court expressed its preliminary views on the adequacy of the EIS, noting with some concern possible deficiencies in the statement's treatment of the uses to which the conservation yield of the dam might be put. At that time the Court directed the defendants to re-examine the construction schedule with a view towards delaying the commencement of actual construction as late as possible to allow supplementation of the EIS, should the Court ultimately find the present statement to be in fact inadequate.

After the Court's indications in chambers, the Army Corps of Engineers under the direction of Colonel James Donovan extensively revised the construction schedule and proceeded to send out telegrams to all prospective bidders, notifying them of the scheduling changes and instructing them that all bids would be received subject to those changes (the former construction schedule and the new schedule are Appendices A and B hereto, respectively). Under the revised schedule, bidding was to open on October 10, 1972, as originally planned. The awarding of the main dam contract, however, was to be postponed almost six weeks, until December 1, 1972. Issuance of the notice to proceed, permitting the contractor to begin assembling crews and equipment was then to be postponed until December 10, 1972. Most significantly, actual construction of the dam was not to begin until March 5, 1973.

In the interim, the United States Bureau of Reclamation agreed to supply supplemental data on the project to the Corps of Engineers, this material then being added to the EIS to remedy such deficiencies as the Court might find to exist. A preliminary hearing on the status of this procedure was then scheduled for November 28, 1972, with a final hearing on the revised EIS scheduled for February 24, 1973. Under this schedule the public would have time to review the final statement and present its views to the Court as to whether the EIS, as revised, conforms to the requirements of NEPA, well before any work of a permanent nature was undertaken at the construction site. In addition, the schedule afforded plaintiffs time to review the supplemental data and to pursue such remedies as they deemed necessary.

Major credit for this rapid scheduling change, allowing supplementation of EIS prior to the actual commencement of work, is to be given to Colonel James Donovan and his staff. On the shortest of notice they succeeded in altering speedily and imaginatively the schedule of work on a 60 to 80 million dollar project with no detriment to the bidders, the taxpayers, or the parties to the suit.

These scheduling changes were explained to the Court and the parties in chambers on Thursday, October 5, 1972. Final arguments on the adequacy of the EIS and on proposed findings of fact and conclusions of law were then heard on Monday, October 9, 1972, after which the Court, in accordance with the revised schedule, announced in open court that it would allow bids to be opened the following day, October 10th.

Plaintiffs Environmental Defense Fund, Inc., et al. and plaintiff-intervenor Sierra Club seek to enjoin the letting of bids and further work on the main dam contract, contending that (1) defendants have failed to comply with the provisions of NEPA and that (2) defendants have failed to obtain permits from the California Water Resources Control Board to appropriate and divert

water from the Stanislaus River before proceeding with the construction of the New Melones Dam, as required by the California Water Code, § 1201 et seq., and the Federal Reclamation Act, 43 U. S.C. § 371 et seq.

Defendants Ellis Armstrong et al. and defendant-intervenors contend that they have complied with the NEPA both in spirit and in fact as required under Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Further, it is contended that even if the statement is technically deficient in some respect, the equities are such that the Court should allow work on the project to continue while the EIS is being supplemented, as was recently done in E.D.F. v. Froehlke, 348 F. Supp. 338 (W.D.Mo.1972).

I

The Stanislaus River has a recorded history of destructive flooding dating back to March, 1907, causing substantial crop, wildlife and property damage to citizens of the Stanislaus River Basin and the Sacramento-San Joaquin Delta. The original New Melones project was thus authorized in 1944 principally as a flood control project, Flood Control Act of 1944, 58 Stat. 887. Since that time, as was demonstrated at trial, substantial water demands have developed in the Basin for purposes of irrigation, fish and wildlife enhancement, power generation, and water quality control. In 1962 Congress therefore re-authorized a substantially enlarged project at the New Melones site, Flood Control Act of 1962, 76 Stat. 1173. As authorized, the dam will sit astride the Stanislaus River, impounding 2.4 million acre feet of water, making it the second largest earth and rock-filled dam in the country. The flood storage control capacity of the dam amounts to 450,000 acre feet, sufficient to protect against the Standard Project Flood, a hypothetical flood equivalent to the worst flood that is likely to occur in a period of between 200 and 500 years.

In 1969 Congress enacted the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., directing all agencies of the federal government to file a detailed Environmental Impact Statement in connection with any major Federal actions significantly affecting the quality of the human environment.[1]

On June 17, 1970, the contract for construction of the diversion tunnel was let, and at the time of trial, approximately 78% of the 25 million dollar project was completed. During the course of the proceedings, it was stipulated by the parties that the tunnel itself was a major Federal action requiring an Environmental Impact Statement,

---

[1]. § 4332(2)(C) provides that all agencies of the Federal Government shall—

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental ·Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes."

but that injunctive relief was not necessary or desirable in light of the near completion of the project.

In May of 1972 the Army Corps of Engineers issued the Environmental Impact Statement covering the construction of the main dam. Suit was brought by plaintiffs in June of 1972, the merits of which we now direct our attention toward, examining first the adequacy of the EIS, second the alleged failure to obtain water permits, and finally, the equities of relief in light of such inadequacies as are found to exist.

## II

The National Environmental Policy Act is a legislative expression of the significance this society attaches to the preservation of the environment. As Judge Peckham of this Court noted in Environmental Law Fund v. Volpe, 340 F.Supp. 1328 (N.D.Cal.1972) at 1331:

"Congress believed that for too many years environmental considerations had been ignored while federal projects blindly forged ahead * * *."

The main foil of the NEPA is the requirement that Environmental Impact Statements accompany all major Federal actions. Section 4332, Title 42, United States Code, which details the factors to be considered in the preparation of such statements, was enacted to insure government agencies would investigate and consider these environmental ramifications, be they apparent or covert.

Because many Federal actions were in some stage of planning or construction when the NEPA was passed, a dispute has emerged in the law as to the extent to which NEPA, and particularly § 4332(2)(C) applies to ongoing projects such as the present project. See, *e. g.*, Brooks v. Volpe, 319 F.Supp. 90 (W.D. Wash.1970); Calvert Cliffs v. AEC, *supra*; Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M. D.Pa.1970); and Environmental Law Fund v. Volpe, *supra*.

The Court is of the opinion that an EIS clearly is required for the New Mel-

ones Project. However, we need not reach this issue in the present case, since all parties have agreed that an EIS was required here. The issue raised goes rather to the adequacy of the EIS which was filed.

The courts have held that while the EIS need not be an exhaustive collection of various and sundry minute scientific details, EDF v. Corps of Engineers, 348 F.Supp. 916 (N.D.Miss.1972), the statement required by the NEPA should, at a minimum, contain "such information as will alert the President, the Council on Environmental Quality, the public, and, indeed, the Congress to all known *possible* environmental consequences of proposed agency action." EDF v. Corps of Engineers, 325 F.Supp. 749, 759 (E.D.Ark.1971). In sum, the EIS is not to be merely an exercise in project justification but rather a working paper of sorts, one essential input into agency decisions concerning the contours of Federal action. Keith v. Volpe, 352 F.Supp. 1324 (C.D.Cal.1972); Calvert Cliffs v. AEC, *supra*; Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971).

In the present case plaintiffs submit that the EIS submitted falls short of such a standard in two principal respects: (1) the statement does not adequately develop, describe, and consider the alternative methods of utilizing the conservation yield of the dam and the environmental impact thereof, as required by 42 U.S.C. § 4332(2)(C)(i); and (2) the statement does not explore all reasonable structural and nonstructural alternatives to the project, as required by 42 U.S.C. § 4332(2)(C)(iii). A number of other deficiencies are also alleged.

Under the present construction schedule, the New Melones Dam will not be completed until 1978. It will then take anywhere from three to ten years for the dam to fill, i. e., to impound its 2.4 million acre feet of water, depending upon the precipitation following its completion.

Approximately 285,000 acre feet constitutes what is known as the conservation yield. The remaining capacity will be used for flood control, fish and wildlife enhancement, maintenance of water quality downstream, etc. It was the government's position at trial that while the EIS dealt extensively with the major uses of the bulk of the impounded water, no discussion of the uses to which the conservation yield would be put was included, because it was felt it was impossible to state with any precision the uses to which that water would be put at the present time. The government therefore proposed to file a separate EIS dealing with the use of the conservation yield, and the environmental impact thereof, at a point nearer in time to the dam's actual operation.

■ Under the circumstances presented in this case, we hold that where the ultimate operation of a project is still in doubt at the time the EIS must be filed, a tentative discussion or "best estimate" of the possible uses to which the project may be directed is nonetheless required. As such, the EIS should be viewed as an interim statement, the first part of a two-step process whereby the responsible Federal officials would first give their best estimate of the uses to which the project will be put, and then prior to actual use, a revised or supplemental statement should be filed either reaffirming those estimates or describing the newer proposed uses and their environmental impacts.

This situation thus differs in some respects from that found by Judge Pregerson in Keith v. Volpe, *supra,* where further acquisition of property for the Century Freeway in Los Angeles was enjoined because the EIS failed to consider the environmental impact of the noise and pollution arising from the operation of the Freeway. Though we strongly affirm the view expressed therein that construction and ultimate operation of major Federal projects cannot be viewed separately, nor dealt with in separate

Environmental Impact Statements, we recognize that the ultimate use to which the conservation yield of a dam is to be put is much more likely to be subject to change than is the ultimate use to which a freeway is to be put.

■ While we find the EIS's discussion of the uses of the major portion of the New Melones Dam's impounded water to be adequate under NEPA, we find the statement to require further supplementation, as explained, to deal with the tentative alternative uses to which the 285,000 acre feet conservation yield may be put, and the environmental impact thereof. As the uses to which that water will be put become more definite, and, in any event, well before the dam actually becomes operational, additional data should be added to the EIS, discussing those uses and their environmental impact.

■ It should be noted, however, that on the record presented to the Court, despite the required further discussion, there is no evidence which would lead the Court to find either that the present structure is in any way unnecessary or that a variation in the proposed uses of the conservation yield would in any way change or affect the type or size of the project presently planned. For this reason, and those discussed in section IV herein, we find that a balancing of the equities requires allowing work on the project to continue, but not the commencement of the actual construction, while the statement is being supplemented.

Under the NEPA, 42 U.S.C. § 4332(2)(C)(iii), and under the Council on Environmental Quality Guidelines, 36 Fed.Reg. 7724 (April 23, 1971), 3 Env. Rptr. Current Development 82, 83, 85 (May 19, 1972), the Environmental Impact Statement must include a "detailed statement" of all reasonable alternatives to the proposed action. Plaintiffs allege that the EIS filed by defendants does not adequately discuss possible structural and nonstructural alternatives to the proposed dam.

■■ While the discussion of alternatives to the proposed dam in the EIS is somewhat brief, being five pages in length, on the whole record we find it to be adequate. As the court in Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222, 228 (M.D.N.C.1972) quoted with approval in holding a seven-page discussion of alternatives to be adequate,

> "The agency need not set forth at full length views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official. Committee for Nuclear Responsibility, Inc., et al. v. Seaborg [463 F.2d 783 (D.C.Cir.1971)]."

The question to be asked is whether all reasonable alternatives to the project have been considered, even if some were only briefly alluded to or mentioned. Natural Resources Defense Council, Inc. et al. v. Morton, 337 F.Supp. 167 (D.C.D.C.1971).

In the EIS for the New Melones Project, considered among the nonstructural alternatives to the proposed dam are channel and levee improvements, flood plain management, and abandonment of the project. Among the structural alternatives considered are possible alternative reservoir sizes, including increasing the size of the downstream Tulloch Dam, and alternative reservoir sizes at the New Melones site. In the latter discussion, mention is made of a 450,000 acre-foot structure, a 1,500,000 acre-foot structure, and a two-step reservoir with an initial gross capacity of 450,000 acre feet, with provisions for enlargement to 1,100,000 acre feet. Since the latter project was that which was originally proposed to and authorized by the Congress in 1944, a more detailed discussion of that project might have been included. On the entire record, however, we are not prepared to find the statement's present discussion of proposed project alternatives to be inadequate. Comm. for Nuclear Responsibility, Inc. v. Seaborg, *supra.*

Plaintiffs allege a host of lesser deficiencies in the EIS, all of which the Court finds to be without merit. We deal here only with the two claims most urgently pressed upon the Court.

■■ Plaintiffs argue that the 3½% discount rate employed in evaluating the project is not in keeping with current economic realities, and hence, that a re-evaluation of the project using a more realistic discount rate must be contained in the EIS. We find this argument uncompelling for two reasons:

(1) The 3½% rate, though arguably unrealistic, is that which Congress has authorized to be used in evaluating government projects. As the court in EDF v. Corps of Engineers, 325 F.Supp. 728 (E.D.Ark.1970) noted at 740:

> "The methods of calculating cost-benefit ratios are innumerable and in many cases esoteric. The Court's judgment as to sound procedures in this regard might well not be in accord with the judgment of Congress. And, as stated above, the Court does not believe it should, in any event, attempt to substitute its judgment for that of the legislature."

(2) In addition, we find no requirement in the NEPA that any such cost-benefit analysis be conducted or included in the EIS.

For both these reasons, we feel plaintiffs' claims on this ground to be without merit.

■ Next, plaintiffs contend that somehow, because this dam will meet but a small fraction of the power needs of the State of California by the time it is operational in the early 1980s, the Court must find the EIS to be inadequate. The Court is of the opinion that the fact that the New Melones Project will ultimately meet only a small fraction of the state's power needs is completely irrelevant in assessing the adequacy of the EIS. Again, we find no such required discussion in the language of NEPA.

More importantly, the Court and all parties will readily agree that the power

needs of California in the year 1980 will far outstrip the capabilities of the New Melones Dam, indeed if not those of all present sources of energy in the state combined. The citizens of this state and nation therefore face a very difficult choice in the near future among three possible sources of power—hydroelectric, fossil fuel, and nuclear energy. While it is the hope of this Court that in keeping with the expression of Congressional intent in enacting NEPA, the state's energy requirements will be met in a manner causing the least adverse impact on the environment, this Court has neither the desire nor indeed the authority to pass upon the potential means by which the Congress ultimately decides to meet those power needs.

### III

Plaintiffs further allege that before proceeding with the construction of the New Melones Dam, defendants must obtain permits from the California Water Resources Control Board in order to divert or appropriate water from the Stanislaus River, as provided for in the California Water Code, §§ 1200 et seq., and § 8 of the Federal Reclamation Act of 1902, 43 U.S.C. § 383. The Federal defendants concede that permits must in fact be obtained, and, to that end, filed with the Board in 1960 applications 14858, 14859, 19303 and 19304. The numerous delays sought and obtained by defendants in the processing of these applications, it is claimed, were necessary to effect conciliation procedures with the numerous permit protestants, a normal practice in such cases.

Under California law all water rights are conditional and thus any person wishing to appropriate public water must file an application for a permit from the California Water Resources Control Board. Cal.Water Code, §§ 1225 and 12205. Section 8 of the Federal Reclamation Act, 43 U.S.C. § 383, provides that the provisions enabling the Bureau of Reclamation to acquire water for use in connection with reclamation projects should not be construed to af-

fect or interfere with state laws relating to the appropriation, use, or distribution of water. Thus, the permit requirement applies equally to Federal agencies as well as to other applicants. In re Application 5625 etc. of the Bureau of Reclamation and the California Department of Water Resources, Delta Water Rights Decision, D–1379, page 18.

From 1960 until July, 1972, the Bureau of Reclamation has sought and received repeated delays in the permit hearings to allow the aforementioned nonlitigated settlements to occur. In July of 1972 the Board declined to grant the Bureau's request for a further continuance and on its own motion scheduled hearings on all applications for October and November. These are currently in progress.

Prior to the passage of NEPA, such delays were thought acceptable to all parties concerned in order to simplify proceedings before the Board. NEPA has substantially altered the framework within which such practices must be viewed, however. Basically, NEPA commands a harmonization of state and Federal agency action. 42 U.S.C. § 4331(b) and 43 U.S.C. § 383.

Under recent decisions of the Water Resources Control Board, the Board has the power to take several steps which clearly would affect Federal appropriation permit applications. First, the Board can subrogate permits for use beyond the watershed to those rights initiated by application for use within the watershed regardless of the date of such applications. Delta Water Rights Decision, D–1379. Second, the Board may impose certain restrictions or conditions upon such permits as it grants. Under Decision 1379 the factors which the Board is to consider include (1) the relative benefits to be derived from all beneficial uses of the water concerned, not only those of the applicant, (2) fish and wildlife preservation, (3) uses such as irrigation, consumption, and the generation of electricity, and (4) maintenance of an adequate water supply in the Del-

ta, sufficient for salt water repulsion and water quality control.

■ Upon inquiry by the Court into the Federal government's position as to the conditions imposed by Decision 1379, the Department of the Interior indicated that it did not regard itself as bound by such conditions insofar as they conflicted with Congressional purposes in authorizing specific water projects.[2] It is beyond the province of the Court in this hearing to decide whether the Bureau of Reclamation is in fact subject to the jurisdiction of the California Water Resources Control Board and its orders. Nevertheless, we conclude that in the future because conditions on water use imposed by the Board may affect the possible alternative uses of water from proposed projects and thereby the nature of the projects themselves, the applications for water diversion should be filed and processed to their conclusion at the earliest possible date, and in any event prior to preparation of the NEPA statement. This is so because the Bureau of Reclamation may acquiesce in the conditions or be found subject to the Board's jurisdiction.

By delaying its applications before the Board, for whatever reasons, the Bureau of Reclamation has made it impossible to evaluate the merits of the proposed project in light of permissible water uses. It is not unreasonable to expect that the Board might place some such conditions upon the permits it grants for diversion of water from the New Melones Dam. Those terms and conditions may have a bearing on the utilization of the dam, and had they been imposed earlier in the life of the project, it is conceivable that

they might have affected the design, the location, or the size of the project. If, for example, the Board ultimately required larger than planned downstream releases for water quality control, a smaller structure might adequately meet the project requirements.

By applying as early as is practicable for the water permits, the permissible water uses can be considered in evaluating the various proposed project alternatives. While delays in the processing of these applications may be necessary, the circumstances in this case do not justify a 12-year delay. It is only by thus coordinating Federal and state agency processes as suggested herein that Congressional intent in enacting NEPA will be given effect.

## IV

■ The Court is called upon at this time to determine whether, in view of such defects in the EIS as have been found to exist, preliminary injunctive relief is in order. While the Court has indeed found a defect in the EIS before it in this case, it is the Court's judgment that at this time (1) the revised schedule of construction adopted by the Court, when complied with, will permit the preparation of a revised EIS in order to obtain full compliance with the NEPA, and (2) that the issuance of a blanket injunction stopping all construction would not speed the preparation of, nor enhance the probabilities that, a sufficient EIS will be prepared. Yet such action would add significant additional costs to the project and delay its ultimate completion. Under the circumstances, a proper balancing of the factors to be considered under general prin-

2. The Department of the Interior's position was made known at the Court's request in a telegram from James R. Smith, Assistant Secretary of the Department of the Interior, delivered to Judge Renfrew during the meeting in chambers on Thursday, October 5th. In that telegram Mr. Smith stated:

"We have concluded that the United States of America cannot be made subject to any terms or conditions imposed by a state agency which would in any way interfere with or affect the operations of federal projects for the purposes for which such projects were authorized by Congress.

"Both decisions 1379 and 1400 purport to require the release of federal water stored behind federally constructed dams for purposes other than those contained in the authorizing legislation."

60

ciples of equity requires that the substantial costs incident to the suspension of work should be avoided while the EIS is being revised. Accordingly, jurisdiction will be maintained to make certain that the schedule adopted is fully complied with.

■ Plaintiff Environmental Defense Fund argues that, as a matter of law, once an EIS is found deficient in some respect, however slight, work on that project must be enjoined forthwith. We disagree. Nothing in the NEPA, its legislative history, or the cases indicates that the Court is to be thus restricted from exercising its equity powers to fashion a decree meeting the needs of the particular case before the Court.

In Daly v. Volpe, 326 F.Supp. 868 (W.D.Wash.1971), the court found that there had not been strict compliance with NEPA, but weighing the possible injury to the citizens of the community and the state against those likely to be sustained by plaintiffs as a result of noncompliance, the court refused to enjoin work on the project. Other instances of the courts' exercise of their equity powers under the NEPA are found in Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970); Conservation Council v. Froehlke (4th Cir. 1972); Wilderness Society v. Morton, 463 F.2d 1261 (D.C.Cir.1972); Environmental Defense Fund v. Froehlke, 348 F.Supp. 338 (W.D.Mo.1972); and SCRAP v. United States, 346 F.Supp. 189 (D.C.D.C.1972).

■ In order to obtain preliminary injunctive relief, plaintiffs must demonstrate that (1) they will suffer immediate and irreparable injury if the injunction is not granted, United Fuel Gas Co. v. Railroad Comm. of Kentucky, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390 (1929); See also Environmental Defense Fund v. Hardin, 325 F.Supp. 1401 (D.C.D.C.1971); and (2) that they are likely to prevail on the merits, Ohio Oil Co. v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972 (1929). Failing this, it is still within the Court's discretion to grant injunctive relief if it is felt that a balancing of the equities so requires.

It cannot validly be contended in this case that continuation of any construction prior to full compliance with NEPA by defendants will wreak irreparable injury on plaintiffs, as required by Sierra Club v. Hickel, *supra*. Under the construction schedule adopted by this Court, no construction having any irreversible impact on the environment will occur prior to March 5, 1973, *after* it has been determined by this Court that defendants have fully complied with NEPA. Moreover, the substantial environmental impact which plaintiffs ultimately seek to fend off will not occur until the dam is actually closed in 1978. Nor can it validly be argued that the power of Congress to change its mind about the project will be precluded by a decision and decree permitting a carefully designed schedule of work to take effect. Sierra Club v. Cliff (E.D.Cal.1972).

As to the likelihood that plaintiffs will prevail on the merits, we have noted that nothing in the record before this Court is likely to lead to a change in the size or type of structure authorized by Congress. In addition, the schedule adopted by the Court will, it is expected, lead to full compliance with NEPA prior to the commencement of any construction by defendants.

Finally, the Court finds that a balancing of the equities requires that work be allowed to proceed on the project while the EIS is being supplemented. Should the New Melones Project be delayed for six months, the parties have stipulated that the approximate increases in costs which would occur amount to 12.6 million dollars. This figure is based on an annual escalation of labor costs of approximately 5% and a seasonal factor necessitated by the fact that certain work on the project must be done during lower water points on the Stanislaus River, thereby limiting the construction season. In addition, if the contractors are forced to rebid the project because of either a delay in opening the bids or

in a postponement of the award date, substantial additional costs would be incurred by the contractors, the subcontractors, and their suppliers in making a second bid.

Also to be weighed in this balance is the potential flood danger to the citizens of the Stanislaus River Basin and the Delta posed by delay in work on the project. See Daley v. Volpe, *supra*.

For the foregoing reasons,

It is hereby ordered that plaintiffs' request for a preliminary injunction is denied.

It is further ordered that the Court retains jurisdiction and the parties are instructed to comply with the scheduling set forth in Appendix C hereto.

## APPENDIX A

### ORIGINAL CONSTRUCTION SCHEDULE

October 10, 1972   Bids on Main Dam Contract to be opened

October 20, 1972   Award of Main Dam Contract

October 30, 1972   Issue of Notice to Proceed on Main Dam Contract

## APPENDIX B

### REVISED CONSTRUCTION SCHEDULE

October 10, 1972   Bids on Main Dam Contract to be opened

December 1, 1972   Award of Main Dam Contract

December 10, 1972   Issue of Notice to Proceed on Main Dam Contract

March 5 1973   Actual construction to commence at project site

## APPENDIX C

### EIS SUPPLEMENTATION SCHEDULE

November 15, 1972   United States Bureau of Reclamation to submit supplemental data on irrigation service areas to Corps of Engineers.

November 22, 1972   Preliminary revised EIS submitted to Court and to the public

November 28 1972   Hearing on preliminary revised EIS in Court

December 1, 1972   EIS supplemental data submitted to other agencies and the public for comment within thirty days.

December 10, 1972   Issue of Notice to Proceed on Main Dam Contract

January 24, 1973   Final revised EIS submitted to Council on Environmental Quality

February 26, 1973   Final revised EIS submitted to Court

February 28, 1973   Hearing on final revised EIS in Court