ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,

v.

Ellis ARMSTRONG, Commissioner, Bureau of Reclamation, et al., Defendants.

No. C-72-1057.

United States District Court, N. D. California.

March 16, 1973.

Michael Palmer, Environmental Defense Fund, Inc., Berkeley, Cal., for plaintiffs.

James Browning, Jr., U. S. Atty., Da-:d E. Golay, Asst. U. S. Atty., San ·.ncisco, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

RENFREW, District Judge.

This memorandum of decision and or-. constitutes this Court's final opinion .~ to the adequacy of the Environmental .mpact Statement ("EIS") filed in con-:ection with the New Melones Project. The project, under the direction of the 'nited States Corps of Army Engineers, ·volves the construction of a 2.4 million · ·e feet capacity earth and rock-filled ::.m known as the New Melones Dam. '''aintiffs and plaintiff-intervenors orig-·nally brought suit on June 8, 1972, ~eeking preliminarily to enjoin further .work on the project on the ground that the EIS filed in connection with the project was inadequate in several re-·pects. The motion for a preliminary injunction and the trial on the merits ·· .onsolidated, and the case was then ..J to the Court on September 27–30 ·d October 9, 1972.

The Court issued its first opinion in ·his matter on November 14, 1972, Envi-

ronmental Defense Fund v. Armstrong, 352 F.Supp. 50 (N.D.Cal.1972). Viewing the project to be discussed in the EIS as including both the construction and the actual operation of the dam, as urged by plaintiffs, the Court found that the EIS was fully adequate in its treatment of the construction phase of the project and that it was also adequate in its treatment of the operation of the dam, except for the discussion therein of the uses to which the 285,000[1] acre-foot conservation yield would be put. The Court found that the failure to desig-· nate, at least preliminarily, the alternative uses to which the conservation yield was to be put, and the environmental impact thereof, mandated a finding. that the EIS was incomplete under the standards set out in the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., and the Council on Environmental Quality Guidelines, 36 F.R. 7724.

However, after hearing extensive arguments from both sides, both in chambers on October 5, 1972, and in open court on October 9, 1972, the Court concluded in its opinion and order that a balancing of the equities required that . the initial work on the project (though no actual construction) not be preliminarily enjoined pending the necessary supplementation of the EIS, as long as the Court retained jurisdiction and thus the power to restrain the·commencement of actual construction work on the project in the event the revised EIS did not meet the requirements of NEPA. The Court clearly determined that such initial work as would occur was activity involving the ordering of equipment, the assembling of work crews, and the like, none of which could have any impact on the environment, adverse or otherwise.

The factors which led the Court to this conclusion were not only the sub-stantial costs to be endured by the tax-

---

1. There is evidence that the conservation yield will be only 250,000 acre feet if it is used to meet local needs. This is because water releases for water quality of approximately 35,000 acre feet per year on a long-term basis will be needed. However, if the New Melones yield is pumped from the Delta, it will be approximately 285,000 acre feet, and the latter figure is used throughout this opinion.

payers were the project delayed, estimated to be some 12 million dollars at a minimum, and the increased flood hazard posed by such delay, but also the more general interest of effectuating. compliance with Congressional dictates. The Court finally decided that in light of the relatively minor defects in the statement, the issuance of a blanket injunction stopping all such initial work on the project, not simply actual on-site construction, would in no way speed the preparation of a sufficient EIS and was therefore inappropriate.

Nonetheless, the Court made it abundantly clear to all concerned that no work on the project which would in any way affect the environment or indeed the site itself could be undertaken prior to completion and submission of a revised EIS which was found by the Court to comply with the requirements of NEPA. It was thus clearly understood by those contracting and undertaking the initial non-construction activity that they did so at their own risk, and that should the project later be enjoined because the EIS was not adequately supplemented, they would bear the costs incurred thereby.[2]

Accordingly, after extensive meetings in chambers with the parties on September 30 and October 5, 1972, the Court drew up a revised construction schedule and a schedule for implementation of the EIS. Environmental Defense Fund v. Armstrong, *supra*, at 61. Under those schedules, no work was to be undertaken at the construction site until March 5, 1973, which was after the final hearing on the revised EIS scheduled for February 23. 1973, which thus gave the Court ample opportunity to enjoin the actual construction of the project in the event the requirements of NEPA had not been met. In the interim, supplementary data on the proposed alternative uses of the conservation yield was to be submitted by the Bureau of Reclamation to the Corps of Army Engineers and a prelimi-

nary or draft revised EIS prepared. The draft statement was then to be submitted to the Council on Environmental Quality ("CEQ") and to the public, as required under NEPA and the CEQ Guidelines.

On November 28, 1972, the first of two scheduled court hearings on the revised EIS was held. At that hearing, the Court, having studied the draft EIS submitted to it on November 22, 1972, afforded counsel for the Environmental Defense Fund and the Sierra Club an opportunity to comment upon the revised statement, noting any deficiencies therein, and to present to the Court any reasons why the Court should alter either the construction or the supplementation schedules. At the hearing, counsel for plaintiffs offered no reason why, in light of the preliminary revised EIS, the Court's schedule should be altered, much less why the project itself should be preliminarily enjoined. Rather counsel reasserted its views that (1) there would be a total loss of the white water were the dam built, an environmental impact which the Court already had held to have been fully discussed in the first EIS, and (2) that once the Court found a deficiency in the EIS, it could not balance the equities but was required, as a matter of law, to enjoin the entire project. As the Court noted in its earlier opinion, Environmental Defense Fund v. Armstrong, *supra*, at 60:

> "Nothing in the NEPA, its legislative history, or the cases indicates that the Court is to be thus restricted from exercising its equity powers to fashion a decree meeting the needs of the particular case before the Court."

Following the November 28th hearing, the Court issued its first Supplemental Memorandum Opinion and Order, in which the Court explained that, having been presented with no reason to alter the schedule as initially announced, the parties were to adhere to that schedule.

2. Colonel Donovan, District Engineer, advised all bidders by telegram of the revised construction schedule set forth in Appendix B to the court's first opinion before the bids were opened on October 10, 1972.

On November 28th, the Court of Appeals for the Ninth Circuit issued a temporary injunction enjoining the Federal defendants from certain action concerning the contract for construction of the dam until December 8, 1972. After several continuations, the Court of Appeals issued an opinion on January 18, 1973, continuing the injunctive relief pending disposition of the appeal. The Court of Appeals then scheduled briefing to conform to the supplementation schedule so as to have a final judgment on the adequacy of the EIS from this Court prior to the commencement of its deliberations.

Accordingly, on January 24, 1973, the final revised EIS was to be submitted to the CEQ, thereby allowing at least thirty days for public and agency comment on the statement prior to the taking of any action," as required under section 10 of the CEQ Guidelines, 36 F.R. 7724: On February 28, 1973, the hearing on the final revised EIS was to be held, after which the Court would determine whether the EIS, as supplemented, fully complied with the requirements set down in NEPA. At the February 28th hearing, however, it was learned that, contrary to the Court's order of November ?, 1972, and possibly in violation of the

CEQ Guidelines, the draft revised EIS submitted to the Court and to the public on November 22, 1972, had apparently not been lodged with the CEQ at that time, and therefore had not fulfilled the 90-day filing requirement of the CEQ Guidelines. The hearing was therefore postponed until March 9, 1973, in order that the Federal defendants could determine precisely when the statement was filed and consequently, how long it did sit with the CEQ.

At the continued hearing on March 9, 1973, however, it was revealed that the draft revised EIS had in fact been supplied to the CEQ on November 28, 1972, and the requirements of the CEQ Guidelines thereby satisfied. Further, counsel for both Environmental Defense Fund and the Sierra Club waived any objections which they may have had to any failure to comply with the filing requirements of the CEQ Guidelines. Thus, the Court proceeded with the continued hearing on the merits as to the adequacy of the revised EIS for the New Melones Project.

At the hearing, plaintiffs offered three reasons why the Court should find that the defendants had not in fact fully complied with the NEPA. These were, first, that as amended, the EIS is still

In a letter to the Court of Appeals dated ?ruary 5, 1973, the California Attorney General misconstrued the purpose of the Court's revised schedule. His assertion that that schedule would have permitted the main dam contract to be awarded only nine days after the Court-ordered supplement to the EIS was made public completely ignores the fact that the schedule specifically provided that no major federal action would be taken which might have any adverse effect on the environment unless and until the Court found that the supplement to the EIS met the requirements of NEPA. Thus, while the Attorney General's office fails to note that the preliminary revised EIS was in fact made public on November 22, 1972, and not on December 1, 1972, the Court feels that to focus on that time period, prior to the awarding of the contract, is to miss the point of the schedule established by this Court on November 14, 1972.

The hearings on the preliminary revised EIS on November 28, 1972, and on the

final revised EIS on February 28, 1973, were designed to afford all parties the opportunity to bring to the Court's attention any deficiencies in the EIS which would require enjoinment of the project. The Court by its schedule specifically provided for compliance with the 90-days and 30-day filing periods required under the CEQ Guidelines, 36 F.R. 7724, prior to the commencement of any actual construction at the site. The fact that the contract had been awarded on December 10, 1972, was of no relevance since the costs which might have been engendered by any delay to or injunction of the project, were the EIS subsequently found to be inadequate, were to be assumed solely by the contractor and thus of no possible prejudice to the public, the government, or the Court, in the fashioning of any equitable decree or in reaching a determination whether the requirements of NEPA had been met.

deficient in that it does not deal with any of the deficiencies alleged to exist in the original May 1972 EIS, but, rather, deals exclusively with the use of the conservation yield of the New Melones Dam. Second, they contend that the supplemental EIS is itself inadequate because (a) it does not assign priorities of need for water among the service areas that it suggests may potentially use New Melones water, (b) it omits all facts regarding the current water supply situation in the Central Valley Project and the need for additional irrigation in California, and (c) it fails to discuss possible alternate sources of supply. Finally, plaintiffs contend that the project should be preliminarily enjoined until the State Water Resources Control Board has reached a decision on the applications for water rights permits. We now turn our attention to the merits of these claims.

Plaintiffs first claim that the EIS is still inadequate in that it does not deal with any of the deficiencies alleged to exist in the original May, 1972 EIS, but rather, deals exclusively with the use of the conservation yield of the New Melones Dam. Specifically, it is claimed that the EIS does not describe the East Side Division or the environmental impact which might be occasioned by its construction, that the EIS does not disclose the variances in costs and benefits that would result if interest rates different from the authorized rate were used in evaluating the economic feasibility of the project, and that the EIS does not discuss alternatives to the dam as currently designed.

■ Each of these alleged deficiencies was raised in the trial on the merits and the Court, in its opinion of November 14, 1972, found against the plaintiffs on each of these points, dealing with them at some length in that opinion. Having considered the matters, the Court reaffirms its view as to each contention. As to plaintiffs' claim that the Court should reconsider its decision in light of the Fourth Circuit's reversal of Conservation Council v. Froehlke, 340

F.Supp. 222 (M.D.N.C.1972), reversed Froehlke v. Conservation Council, 473 F.2d 664 (4th Cir., Feb. 8, 1973), we note simply that in discussing the EIS treatment of alternatives to the structure, the language which this Court quoted from the reversed case was actually quoted by the *Froehlke* court with approval from Committee for Nuclear Responsibility, Inc., et al. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971). More importantly, however, this Court is of the view, expressed previously, that all reasonable alternatives to the project have been considered, even if some were only briefly alluded to or mentioned, and that therefore, the requirements of NEPA have been met. Environmental Defense Fund v. Armstrong, *supra*, 352 F.Supp. at 57.

■ Thus, while the plaintiffs' contention that the revised EIS deals exclusively with the uses to which the conservation yield may be put is clearly true, a reading of this Court's opinion of November 14, 1972, reveals that this is as it should be, since the only deficiency which the Court found in the EIS was its discussion of the uses to which the yield would be put, and it was only on that point that the Court ordered supplementation of the EIS. Accordingly, the Court finds plaintiffs' first claim to be without merit.

The plaintiffs then challenge the sufficiency of the supplementary EIS itself. The first deficiency alleged is the statement's failure to assign priorities of need for water among the service areas that may potentially use New Melones water, which, it is alleged, renders useless for critical analysis by the decision-makers the data contained therein. A mere cataloging of potential service areas, it is claimed, without an attempt to assess the relative priorities of those areas does not constitute a "best estimate" of the possible uses to which the conservation yield may be put, as required by this Court in its earliest decision. Environmental Defense Fund v. Armstrong, *supra*, at 56. The Court

must reject this argument for several very important reasons.

First, before any appropriation or diversion of water can occur, California Water Code § 1250 et seq. requires that a permit be obtained from the State Water Resources Control Board. Under § 1260 of the Water Code, all such applications must set forth, among other things, the nature and the amount of the proposed use and the place where it is intended to use the water. Cal.Water Code § 1260(c) and (f). In the case of the New Melones Dam, however, it is certain that no diversion of water will occur for at least another eight years. Under these circumstances, it is in fact impossible to assign priorities of use to the New Melones water at the present time. Authority for the view that it is premature to do so at the present time is found in the comments to Colonel Donovan from Secretary of Resources of the State of California, N. B. Livermore, Jr.:

"It is recognized that the actual place of use of the project yield cannot be determined at this time because changes in demand and other factors are likely to occur between now and 1980, the earliest date when the yield would be available from New Melones Lake. A significant factor that could influence the area of use will be the decision on project water rights by the State Water Resources Control Board." Supplemental EIS. Attachment A.

Aside from the practical problems of assigning priorities at the present time, an examination of the authorizing statute itself reveals that definite priorities are established therein. 76 Stat. 1163 1962). It is provided at 1191 that:

"[B]efore initiating any diversions of water from the Stanislaus River Basin in connection with the operation of the Central Valley project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin and the diversions shall at all times be subordinate to the quantities so determined."

It would thus appear that at least as far as federal defendants are concerned, Congress has itself established a priority of uses, and that any further discussion thereof in the EIS would be pointless.

Finally, independent of the practical difficulties of designating priorities at the present time, the language of the enabling act, and the requirements of the California Water Code, this Court has sought to assure that at least additional data, and more probably a second EIS, would be forthcoming dealing specifically with the operation of the project by retaining jurisdiction over this matter and overseeing it through its development. As the Court said in its opinion, Environmental Defense Fund v. Armstrong, supra, at 56:

"[T]he EIS should be viewed as an interim statement, the first part of a two-step process whereby the responsible Federal officials would first give their best estimate of the uses to which the project will be put, and then prior to actual use, a revised or supplemental statement should be filed either reaffirming those estimates or describing the newer proposed uses and their environmental impacts."

Accordingly, the Court finds that at present the failure to assign priorities of need for water among the alternative uses does not constitute noncompliance with NEPA where, as here, the record clearly indicates that (a) the priorities cannot meaningfully be determined at the present time, (b) there is specific Federal statutory language in the enabling act establishing such priorities as to Federal defendants, and (c) where the Court has explicitly retained jurisdiction over the case to insure that data dealing with the operation of the dam is forthcoming in a future or supplemental EIS, well before the New Melones Dam actually becomes operational. Accordingly, the Court must reject

138

plaintiffs' first reason for claiming the supplemental EIS itself to be deficient.

As a second reason for finding the supplemental EIS itself to be inadequate, plaintiffs allege that it does not contain any information about the current availability of water in the Central Valley Project or the need for additional irrigation in California. This omission is affirmatively misleading, it is claimed, because it leads the decision-makers to believe that there is now a critical shortage of supply in the Central Valley Project and a need for more irrigation in California, when, in fact, there is substantial controversy as to both these needs.

 Initially, it must be recognized that plaintiffs are not claiming that the EIS does not contain information as to current supply and irrigation needs, but, rather, they are disputing the sense of the information which is contained therein. Accordingly, the Court determines that the deficiencies alleged go not to the adequacy or inadequacy of the EIS as revised, but to the merits of the project itself. The latter are something upon which Congress and not the courts must pass, and plaintiffs' objections must therefore fail. Under NEPA the courts' inquiry must be directed toward ascertaining whether or not certain information is included rather than to a determination of the truth or accuracy of the impression created thereby, absent an allegation that the agency had acted arbitrarily or capriciously in its presentation of information. 5 U.S.C. § 706(2)(A).

Even if the Court were to assume that plaintiffs were alleging that the Corps and the Bureau had so acted in their preparation of the supplemental EIS,

thus requiring the Court to go to the merits somewhat, plaintiffs would fail. Their claims are based upon a chart entitled "Central Valley Project—Sacramento River Basin and Delta Water Supply—1972 Contract Quantities—Present and Projected Uses," attached as Exhibit Four to their memorandum of February 26, 1973. On the basis of that chart, it is claimed by plaintiffs that there is a greater supply of water than is presently under contract. Their claims must fail for two reasons. First, the chart deals with water under contract only and does not include present and future requests for water, which are in fact quite substantial.[4] Second, aside from these additional requests for water, other important water demands were not accounted for on the chart. Aside from the contracted for water and assuming, no matter how unrealistically, that the state itself does not increase its present level of water diversion, no account has been made for the increased demands on the various projects for purposes of water quality control under Decision 1379 and Decision 1400 which the State Water Resources Control Board might see fit to impose upon the permits granted the projects.[5] Also to be considered are the very substantial water demands for fish and wildlife preservation being urged at the water rights hearings by the State Department of Fish and Game.[6]

 Accordingly, the Court finds a demonstrated need for the New Melones water, at least substantial enough to rebut any possible charge that defendants have acted arbitrarily or capriciously in stating that "There is not enough water available and new water sources are needed." EIS at B–19. Ac-

4. In fact, when taking into account the ultimate amounts of water contracted for and the requests for water received to date, they exceed the supply of water available today in the Central Valley Project.

5. Requirements by the California Regional Water Quality Control Board for total-dissolved-solids control in the Stanislaus

River and in the San Joaquin River amount to 70,000 acre feet.

6. At the water rights hearing, the California Department of Fish and Game presented information demonstrating the need for 263,000 acre feet, or virtually the entire conservation yield of the New Melones Project.

cordingly, plaintiffs' second alleged deficiency in the supplemental EIS must fail.

Plaintiffs' third and final claim that the supplemental EIS is itself inadequate is based on their allegation that the failure of the statement to discuss possible alternative sources of supply, some of which may have a lesser economic and/or environmental cost than the New Melones Project, is affirmatively misleading.

Initially, the Court would point out that the original May 1972 EIS did in fact deal with alternatives to the New Melones structure and, hence, with alternative sources of supply. As noted both earlier in this opinion and in the opinion of November 14, 1972, the Court finds that the discussion of alternatives thereto was adequate.

The Court also understands the plaintiffs urging that a comprehensive study of the Central Valley Project be made, viewing the system of state and federal water projects as an integrated unit. While the Court agrees with the wisdom of so doing, NEPA itself does not so require. In Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1972), a comprehensive study had been undertaken but not completed before impact statements had been prepared for certain major federal actions. The Court held that there was no error in proceeding with impact statements for those projects prior to completion of the comprehensive study. Here, no comprehensive study has been commenced, let alone completed. Under these circumstances

there is no requirement under NEPA that the EIS with respect to the New Melones Project be delayed until a comprehensive study of the Central Valley Project be completed. So long as each major federal action is undertaken individually and not as an indivisible, integral part of an integrated state-wide system, then the requirements of NEPA are determined on an individual major federal action basis. Plaintiffs' suggestion that there is need for a comprehensive study of the Central Valley Project should be made to the Congress, and not to the Court.

The Court is also somewhat concerned by the thrust of plaintiffs' arguments as to alternate sources of supply. By requiring the exploration of all other possible sources of supply, and their respective environmental impacts, plaintiffs place an impossible task upon defendants in the preparation of such statements by requiring them to examine an ever-expanding range of alternatives to the project, and then alternatives to those alternatives. Accordingly, this Court has held only that plaintiffs must discuss all reasonable alternatives to the present project and their environmental impacts, Natural Resources Defense Council, Inc., et al. v. Morton, 337 F. Supp. 167 (D.C.1971), and that in this case they have in fact done so.

Having examined each of plaintiffs' three bases for claiming the supplemental EIS itself to be deficient,[7] and having found each to be without merit, the Court holds that the EIS as revised, including both the original and the supplemental statements, complies fully with

---

[7] The Court is concerned with the failure of plaintiff Environmental Defense Fund (EDF), which is assumed to be inadvertent, to make a complete disclosure of its position with respect to alternate sources of supply. EDF points to the Auburn-Folsom South Project as one such alternative while it has both publicly opposed and sued to enjoin construction of that project and, in so opposing, have offered the New Melones Project as an alternate source of supply. However, before this Court it did not dis-close that it had sued to enjoin construction of the Auburn-Folsom South Project nor did it disclose in its opposition to the Auburn-Folsom South Project that it also sued to enjoin the New Melones Project. The Court disapproves the practice in which one project is played against another, without complete disclosure of the opposition to both projects. The Court does not question EDF's good faith in opposing both projects, only its apparently inadvertent failure to so disclose.

140

the requirements of NEPA. The Court therefore directs its attention to the last of plaintiffs' reasons for urging that activity on the New Melones Project be enjoined.

Finally, plaintiffs contend that aside from any question of the adequacy of the EIS, the project should be preliminarily enjoined until the State Water Resources Control Board has made a decision on the applications for water rights permits in connection with the New Melones Project.

Viewing the project and the permits in perspective, the Court notes that we are really dealing with only 285,000 acre feet of the 2.4 million acre feet of the project. Having found the equities of the situation to go against plaintiffs when the EIS was initially found to require further supplementation, the Court feels that they now weigh even more heavily against them where the statement is in fact adequate and where the water permits of concern to plaintiffs involve such a small part of the total project.

A further consideration on this point is the time delay involved. Decisions 1379 and 1400 were issued in 1971 and are currently in the early stages of federal litigation, the cases having recently been removed from state court to the United States District Court for the Eastern District of California. The time delay involved is thus not simply one of a month or two, at which time the decision on the permits will be issued, but perhaps two or three years until the courts decide whether the present injunction on the application of those decisions should be lifted or not, and, in essence, whether those two decisions will be given effect. Again, the delay would be occasioned by permits involving only a very minor part of the total project.

■ Accordingly, this Court is of the view that it would be both unwise and unjust to enjoin the entire project pending a decision of the State Water Resources Control Board on the applications for water permits. This is partic-

ularly so where, as here, the Court has retained jurisdiction and has required that before the conservation yield is to be utilized, defendants file a final EIS as to the operation of the project and the environmental impact thereof.

This opinion and the two earlier opinions of the Court in this matter, issued on November 14, 1972, and November 29, 1972, constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules.

■ Accordingly, the Court finds that the Environmental Impact Statement, as revised, complies fully with the requirements of NEPA, and that the relief plaintiffs seek must be denied.

The Court will, however, pursuant to these opinions, retain jurisdiction over this matter to insure a full compliance with its order that there be filed a further Environmental Impact Statement or at least additional data on the operation of the project prior to the actual use of any of the conservation yield of the dam.