487 F.2d 814
 6 ERC 1068, 4 Envtl. L. Rep. 20,001
 ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs-Appellants,
v.
Ellis ARMSTRONG, Commissioner, Bureau of Reclamation, et
al., Defendants-Appellees.
ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs, and
The Sierra Club, Plaintiff-Appellant,
v.
Ellis ARMSTRONG, Commissioner, Bureau of Reclamation, et
al., Defendants-Appellees.
 Nos. 72-2997, 72-3170.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 9, 1973.
 
 John A. Edginton (argued), Graham & James, San Francisco, Cal., Michael W. Palmer (argued), Thomas J. Graff, the Environmental Defense Fund, Berkeley, Cal., Harry D. Page, Paul A. Dezurick, Graham & James, San Francisco, Cal., for plaintiffs-appellants.
 Edmund B. Clark, (argued), Dept. of Justice, Washington, D. C., Thomas J. Shepard, (argued), Robert C. Morrison, Neumiller, Beardslee, Siegert, Glahn, Shepard & Greene, Stockton, Cal., Kent Frizzell, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., James L. Browning, Jr., U. S. Atty., David E. Golay, Asst. U. S. Atty., San Francisco, Cal., Richard W. Dickenson, County Counsel, Michael N. Garrigan, Deputy County Counsel, Stockton, Cal., Douglas N. King, George R. Hyde, Dept. of Justice, Washington, D. C., Paul R. Haerle, Joseph A. Darrell, Thelen, Marrin Johnson & Bridges, P. H. McCarthy, Jr., McCarthy, Johnson & Miller, San Francisco, Cal., D. Steven Blake, Sacramento, Cal., for defendants-appellees.
 Before HASTIE,* TRASK and CHOY, Circuit Judges.
 TRASK, Circuit Judge:
 
 
 1
 This is another case challenging the adequacy of an Environmental Impact Statement (EIS) under the provisions of the National Environmental Policy Act of 1969, 42 U.S.C. Sec. 4321 et seq. (NEPA). The statement was filed because a public works project known as the New Melones Dam across the Stanislaus River in California constituted a "major Federal action" which would significantly affect the quality of the human environment. The dam was originally authorized by Congress under the Flood Control Act of 1944 and reauthorized under the Flood Control Act of 1962, 76 Stat. 1180, as a multi-purpose project with benefits of flood control, irrigation, fish and wildlife enhancement, power generation and water quality control. The diversion tunnel, a 25 million dollar project, had been substantially completed at the time this action was filed and was therefore not the subject of requested relief. The main construction contract had not been let and this action concerns that contract and the completion of the project. An injunction pending the resolution of this appeal has stayed further project action.
 
 
 2
 The principal plaintiff is Environmental Defense Fund, Inc. (EDF),[1] joined by eleven rafting companies engaged in the business of conducting commercial raft trips on the white water reaches of the Stanislaus River, two individuals who allege that their raft and kayak trips will be injured by the proposed construction, and one individual who alleges his mining claim will be destroyed. Defendants are the Secretary of the Interior, the Commissioner of the Bureau of Reclamation, the Secretary of the Army and various officers of the Corps of Engineers.[2]
 
 
 3
 The matter has been before the District Court on two occasions. On the first hearing the court determined that:
 
 
 4
 1. The plaintiffs' request for a preliminary injunction should be denied.
 
 
 5
 2. A supplemental EIS should be submitted by the government discussing the uses of the water produced as the "conservation yield" of the project. This EIS was to be submitted to other concerned agencies and to the public inviting comment within 30 days after submission.
 
 
 6
 3. The final revised EIS should be submitted to the Council on Environmental Quality and to the court and thereafter a second hearing was to be held, with the court retaining jurisdiction of the matter pending final hearing. Environmental Defense Fund, Inc., et al. v. Ellis Armstrong, Commissioner, Bureau of Reclamation, et al., 352 F.Supp. 50 (N.D.Cal.1972).
 
 
 7
 A second EIS was promptly prepared entitled "Supplemental Data on Use of Conservation Yield," and circulated as required, and the final revised EIS submitted to the Council on Environmental Quality (CEQ) and to the public. At the continued hearing before the District Court on March 9, 1973, both the EDF and the Sierra Club waived any objections to a failure to comply with the filing or circulation requirements set out in the CEQ guidelines, and the court proceeded to consider the question of the adequacy of the revised EIS for the New Melones Project.[3]
 
 
 8
 Three objections were made to the adequacy of the EIS in its final form. The first was that the supplemental portion dealt only with the conservation yield. This argument was rejected summarily by the court upon the ground that the conservation yield was precisely that to which the trial court had directed the government to address its comments.
 
 
 9
 Second, complaint was made that the final EIS did not assign priorities of need for the conservation yield, and did not discuss alternate sources of supply and the facts regarding the current water supply in the Central Valley Project of which this dam was alleged to be a part. On this latter issue, the trial court held that it was not the task of the EIS to examine all possible alternative sources of water supply but only those that are reasonable with regard to the project under examination. This was done. We agree with and affirm the judgment of the trial court that the EIS was in fact adequate.[4] As to the assignment of priorities, the trial court pointed out that there was a time lag of at least eight years between the commencement of construction and the accumulation of the conservation pool. It would be improvident to make a priority commitment now for needs which might be vastly changed when the water became available. The court's conclusion, to retain jurisdiction throughout the project's development, provides sufficient protection for all parties. The evidence of available water supply without New Melones, and thus the project's need, was in no real conflict. There was a dispute as to the evaluation of that evidence. The court found, and we agree, that correctly interpreted the conservation yield of the project could be used now and would clearly be needed by the time the project becomes operational.
 
 
 10
 The third challenge to the final statement was for the reason that alternatives for the project were not sufficiently set forth. Yet in the original statement before supplementation, there was a discussion of alternative reservoir sites (original EIS at 73); alternative reservoir sizes at the New Melones site; alternatives to the planned operation such as releases downstream to enhance fisheries and water quality and to meet the demands of other nearby service areas; and alternatives to constructing the reservoir itself, such as channel and levee improvements, floodplain management and abandonment of the project. Again, prior to the initiation of the conservation function of the pool, the Bureau of Reclamation, charged with operation, proposes to prepare another supplementary statement covering the impact of the use of its water supply.
 
 
 11
 The District Court thereupon found that the Environmental Impact Statement as revised complied fully with the requirements of NEPA and denied relief to the plaintiffs.
 
 
 12
 Two questions are before us on this appeal. The first is the matter of appellate review of the decisions of the District Court upon the issues raised there. The second is the effect of a decision of the California State Water Resources Control Board (SWRCB), numbered 1422, which was issued shortly after this appeal was taken.
 
 
 13
 Each of the parties to this appeal appears to advocate that the standard for appellate review of a trial court decision on the adequacy of the EIS is the "clearly erroneous" test under section 52(a) of the Federal Rules of Civil Procedure.[5] An examination of the Act, and of the cases decided under it, does not support such a conclusion. More often the courts look to the provisions of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A),[6] Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973); Silva v. Lynn, 482 F.2d 1282 (1st Cir. 1973).[7] We do likewise here.
 
 
 14
 *****
 
 
 15
 * * *
 
 
 16
 The EIS as revised has been reviewed on appeal and we agree with the judgment of the District Court as to its adequacy under NEPA requirements, as measured by 5 U.S.C. Sec. 706(2)(A).
 
 
 17
 The final question is one which has developed pending the appeal. In the trial court the plaintiffs had contended that before proceeding with construction the government must obtain permits from the SWRCB. In 1960 the federal defendants had filed applications for permits to appropriate water from the Stanislaus River by direct diversion and by storage. The applications were made pursuant to section 1200 et seq. of the California Water Code and section 8 of the Federal Reclamation Act of 1902, 43 U.S.C. Sec. 383. Between 1960 and 1972 the Bureau of Reclamation had sought delays in order to negotiate differences, but in 1972 the SWRCB forced the matter to hearing, which was the posture of the case when this litigation was decided on March 16, 1973. See Environmental Defense Fund, Inc. v. Armstrong, 356 F.Supp. 131, 140 (N.D.Cal.1973); Environmental Defense Fund, Inc. v. Armstrong, 352 F.Supp. 50, 58 (N.D.Cal.1972). On April 4, 1973, the SWRCB issued its Decision 1422, granting the requests sought by the Bureau of Reclamation in part and imposing conditions. It is not known at this time whether the Bureau has taken any further action with respect to the decision of the State Board.[8]
 
 
 18
 This decision was promptly made known to both the responsible agency and to the CEQ for, under date of April 17, 1973, a letter was written by Russell E. Train, Chairman of the Council to Kenneth E. BeLieu, Under Secretary of the Department of the Army, calling attention to it.[9] The suggestion of Chairman Train that another supplemental draft EIS be prepared and circulated calls for careful consideration. We turn then to Decision 1422 of the SWRCB for an answer to that question.[10]
 
 
 19
 After describing the project, the decision notes the protests to the applications filed by the irrigation districts and public agencies pointing out that "most of the protestants now have no objection to the project." Their principal concern, it states, is in the "manner in which the project will be operated." The plaintiffs in this case were, of course, also protestants before the Board; their protests, as indicated, go beyond those of the public corporations and agencies.
 
 
 20
 The Board first considers the amount of water that should be released to satisfy requirements for achieving and maintaining water quality objectives (pp. 11-13). It concludes that the Board should reserve jurisdiction for the purpose of revising water release requirements for water quality objectives.
 
 
 21
 Use of the conservation yield for irrigation or other consumptive uses is next discussed (pp. 13-20), and the Bureau is criticized for failing now to present evidence of a specific plan to use the conservation yield for designated consumptive uses. The Board points out, however, that the record contains "substantial evidence that the full conservation yield of the New Melones Project, and more," will eventually be needed in the counties of the Stanislaus River Basin.[11] It then proceeds to balance the undefined needs for impoundment against the adverse consequences of impoundment including injury to white water boating, stream fishing and other stream-related activities, and decides that permits should prohibit impoundment for additional consumptive purposes until further order of the Board. It further provides that permits for consumptive purposes outside the basin counties should be subordinate to beneficial uses within the counties. The restriction of use of the water to satisfy existing and anticipated intra-basin needs before export was already a part of the project authorization.[12]
 
 
 22
 *****
 
 
 23
 * * *
 
 
 24
 Releases for preservation and enhancement of fish and wildlife are next discussed (pp. 20-21) concluding with a decision that permits should require the release of up to 98,000 acre feet per annum for maintenance of fish and wildlife with jurisdiction reserved to revise these releases "upon reviewing the results of further studies."
 
 
 25
 Releases for consumptive uses to satisfy dry year criteria are mentioned but no specifics are stated.
 
 
 26
 Hydroelectric Power Development is the next item reviewed (pp. 21-24). In considering storage for power the Board's opinion becomes obscure. It begins by saying that because there is considerable question as to the need for storage of water "in the proposed quantities for purposes other than the generation of power," it will determine whether the project's "power benefit alone" will justify storage in addition to that presently needed for other purposes. Measured by this yardstick it concludes that the adverse recreational effects on stream fishing, white water boating and wildlife weigh more heavily than the need for power and thus the requested storage may not be allowed in full. It acknowledges that this reduction in storage will reduce the annual electrical energy production and admits that the opportunity to contribute to the solution of present power supply problems should not be overlooked, but notes that the project was not proposed as a means of alleviating the power shortage. It makes plain also that "as the demand for water for consumptive uses increases and storage for those uses is authorized, storage for power purposes will also be considered." It notes that if the Bureau eventually substantiates the need for storage for consumptive use purposes out-of-basin large quantities of delivery power will be needed and the development of the full power potential of New Melones should be considered.
 
 
 27
 The summary of the Board is as follows: (in part)
 
 
 28
 "The public interest requires that the use of the Stanislaus River for whitewater boating, stream fishing and wildlife habitat be protected to the extent that water is not needed for other beneficial uses. Therefore, although there is a demonstrated need for the full yield of the project in the four basin counties at some time in the future, but for which no contracts have been negotiated, and in view of the adverse effect the proposed reservoir will have upon these recreational uses, impoundment of water to satisfy that need should not be permitted at this time. Instead, the Board should retain jurisdiction over the permits for the purpose of approving incremental appropriations for consumptive use up to the quantities covered by the applications when the need for the water is substantiated.
 
 
 29
 ******
 
 
 30
 * * *
 
 
 31
 "Beneficial use of project water can be made for the generation of power. However, preservation of the existing upstream reach of the river for recreation values conflicts with increased storage for power purposes. Therefore, storage for power generation should be approved, but limited to the amount authorized for other project purposes."
 
 
 32
 The order approves the applications in part and provides that the requested permits issue subject to conditions and limitations stated. The conditions and limitations are with respect to the manner in which the project is to be operated. It imposes no restriction upon the size of the construction project or the ultimate capacity of the dam as planned by the Bureau. It reduces the quantity of water to be appropriated under Application 19303 from the 2,420,000 acre feet per annum by storage, as requested, to the quantity, not to exceed 1,420,000 acre feet per annum, which can beneficially be used for power purposes. It reduces the quantity of water to be appropriated under Application 19304 for irrigation, domestic, municipal, industrial, fish culture, recreation and water quality control purposes from the 2,420,000 acre feet per annum by storage to a maximum of 1,420,000 acre feet per annum and states in this regard that "[u]ntil further order of the State Water Resources Control Board, the water shall be used only for preservation and enhancement of fish and wildlife, recreation and water control purposes." Paragraph four of the order continues with reference to permits under applications 14858 and 19304 and authorizes use of water therein approved for consumptive uses in Stanislaus, Calaveras, Tuolumne and San Joaquin Counties and invites a petition to amend to include other areas where necessary.
 
 
 33
 Assuming that the order as outlined is final, is not modified in further proceedings and is binding upon the federal agency, Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), the federal agency has obtained permission to construct the project as planned but its operation is limited by the decision to a reduction of one-half of its proposed capacity for storage for power purposes. By such a reduction the recreational uses are preserved. Jurisdiction is retained to permit an increase in actual storage should a justifiable need be demonstrated.
 
 
 34
 The decision makers, Corps of Engineers and Bureau of Reclamation, are fully aware of the order, its effect and its implications. The Bureau of Reclamation was the applicant before the State Board in the proceeding which resulted in Decision 1422. The Chairman of the Council of Environmental Quality also has the decision. It does not affect the trial court's decision with respect to the adequacy of the EIS upon the project as planned to be built and to operate. It does affect the operation of the project by protecting those who have objected on behalf of white water enthusiasts, stream fishermen and wildlife interests. It is subject to modification by its own terms upon change of conditions and recognizes that "there is a demonstrated need for the full yield of the project" at some time in the future. Therefore, the summary states that the Board "should retain jurisdiction over the permits for the purpose of approving incremental appropriations when the need for the water is substantiated."
 
 
 35
 There appears agreement that the project cannot be completed in any event until some eight to ten years from date of beginning of construction. How the water and power needs may change during that period is problematical. Litigation is now pending to determine whether and to what extent the order of the Board may be binding upon the federal defendants.
 
 
 36
 The District Court has twice examined the adequacy of the EIS assuming optimum operating conditions as projected by the authorizing agency and has held that it is adequate as revised and supplemented. We have examined those proceedings carefully and agree with the District Court. The NEPA has served its purpose. It has stimulated a full examination of all objections, adverse consequences, alternatives and, with the decision of the SWRCB, possible operational limitations. It now becomes a question of project justification in the light of all known and possible consequences.[13] Future changes which may have a significant effect upon the environment, not heretofore examined, may be brought to the attention of the District Court under its reserved jurisdiction.
 
 
 37
 We affirm the judgments of the District Court and vacate all orders granting injunctions by this court.
 
 
 
 *
 Honorable William H. Hastie, United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 Intervenor on the side of the plaintiffs is The Sierra Club
 
 
 [2]
 Intervenors on the side of the defendants are:
 The County of Calaveras, the Calaveras County Water District, San Joaquin County Flood Control and Water Conservation District, County of Stanislaus, County of Tuolumne, City of Escalon, City of Riverbank, City of Modesto, City of Oakdale, City of Ripon, City of Stockton, Salida Sanitary District, Reclamation District 2075, San Joaquin River Water Users Company, Federal Land Bank Association of Modesto, Federal Land Bank Association of Stockton, Stanislaus River Flood Control Association, Del Rio Golf and Country Club, Gerald Barton, Mae Giovanetti, John Hertle, Manuel Macedo, Paul A. Philbin, Raymond Arroquy, Donald R. Fairchild, William Jiminez, Mountain Counties Water Resources Association, Associated General Contractors of California, Inc., California State Conference of Operating Engineers and State Building and Construction Trades Council of California.
 
 
 [3]
 In the meantime this court issued a temporary injunction restraining construction which was later continued in effect after final disposition in the District Court until this appeal could be determined
 
 
 [4]
 The second opinion of the District Court in this matter is reported in 356 F.Supp. 131 (N.D.Cal.1973). Attention is invited to both opinions for the details of the controversy which is discussed generally herein, and for the excellent discussion by the court of the legal issues involved
 
 
 [5]
 Where the question is the threshold jurisdictional test of whether the Act applies or does not apply, the standard is whether the plaintiff has alleged facts which, if true, show that the proposed project would materially degrade any aspect of environmental quality. Save Our Ten Acres v. Kreger, 472 F.2d 463, 466 (5th Cir. 1972). Compare Hanly v. Kleindienst, 471 F.2d 823, 829 (2d Cir. 1972), using the "arbitrary and capricious" standard, and the cases cited at 471 F.2d 823, 829 n. 9
 Where the Act creating the Agency has established a special standard of review, that standard will of course apply. Scenic Hudson Reservation Conference v. Federal Power Commission, 453 F.2d 463, 467 (2d Cir. 1971).
 
 
 [6]
 5 U.S.C. Sec. 706(2)(A) provides in pertinent part:
 ". . . [T]he reviewing court shall-
 "(2) hold unlawful and set aside agency action, findings, and conclusions found to be-
 "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .."
 
 
 [7]
 But see Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1280 (9th Cir. 1973), which uses 5 U.S.C. Sec. 706(2)(D) as the appropriate standard, permitting appellate review of findings and conclusions found to be "without observance of procedure required by law." Under the circumstances of this case, either test would lead to the same result
 
 
 [8]
 The official position of the Bureau of Reclamation with respect to the authority of SWRCB over it was made known to the trial court by telegram from James R. Smith, Assistant Secretary of the Interior, in response to a request from the trial court. 352 F.Supp. 50, 59 n. 2. The position in substance was that the Bureau was not subject to terms and conditions imposed by a state agency
 We take judicial notice of the fact that on June 12, 1973, the Attorney General of California filed an action, Docket Number 73-0984, in the United States District Court for the Northern District of California on behalf of the SWRCB against the Secretary of the Interior and the Commissioner of Reclamation to establish whether the state agency may impose conditions upon the federal agency. On July 20, 1973, the case was transferred to the United States District Court for the Eastern District of California, where it is now pending.
 We are also advised by the appellant, Sierra Club, in its opening brief that the obligation, if any, of the Bureau of Reclamation to comply with orders of the State Water Resources Control Board is presently subjudice in Central Valley Eastside Project Assn. v. SWRCB, (E.D.Cal.Civ. No. S2582); and in Kern County Water Agency v. SWRCB, (E.D.Cal.Civ. No. S2583).
 
 
 [9]
 "EXECUTIVE OFFICE OF THE PRESIDENT
 Council on Environmental Quality
 
 
 [712]
 Benson Place, N.W
 Washington, D. C.
 "Dear Mr. BeLieu:
 "I am writing in regard to the New Melones Reservoir project being proposed by the Corps of Engineers. The project is now before the U.S. Court of Appeals for the Ninth Circuit on the issue of NEPA compliance.
 "The outcome of the State Water Resources Control Board deliberations on New Melones water rights has been a central question in the case. The Board issued Decision 1422 on April 4, 1973, getting out the States' position on water rights. The Bureau of Reclamation was granted water rights permits, but subject to 25 limitations and conditions. These conditions will have significant impact on the operation of the New Melones Reservoir, and might well impair full effectuation of the project purposes.
 "We have reviewed Decision 1422 along with the final environmental impact statement and its supplement. It appears to us that the Board's decision constitutes a significant new development, requiring some further response by the concerned Federal agencies before irreversible actions are taken on the project as originally proposed. In particular, we would like to know the views of the Corps of Engineers and/or the Bureau of Reclamation on the following issues:
 "1. If Decision 1422 is ultimately accepted as controlling on the water rights issue, what effect does the decision have on the environmental analysis conducted in the existing impact statement?
 "2. What arrangements has the Bureau of Reclamation or the Corps of Engineers made to reassess the alleged benefits of the project against the potential environmental costs in light of Decision 1422?
 "3. Since The Bureau of Reclamation is challenging State jurisdiction over the water rights issue, does this mean that the project as originally designed depends on a favorable outcome of this legal challenge? If so, what provisions are being made for accommodating the project to an unfavorable decision (upholding the State's jurisdiction) if that eventually should occur?
 "We think that a supplemental draft environmental impact statement would be [sic] logical vehicle for discussing these questions and the implications in general of Decision 1422-particularly if the environmental analysis conducted in the original statement is found to be significantly affected by the Decision. It is important that some response to the issues raised by the Board's decision be prepared and circulated for review by interested parties prior to further action. In this connection it may be appropriate to request postponement of the present litigation until the agencies involved have had an opportunity to conduct such a reappraisal.
 "I look forward to hearing from you soon. Please give me a call if you have any questions or wish to discuss the matter.
 "Sincerely,
 "/s/Russ
 "Russell E. Train
 "Chairman
 "Honorable Kenneth E. BeLieu
 Under Secretary
 Department of the Army
 Washington, D. C. 20310"
 
 
 [10]
 References to pages of the SWRCB decision are to the decision as reprinted in the appendix to the Defendants'-Intervenors' brief
 
 
 [11]
 "The record contains substantial evidence that the full conservation yield of the New Melones Project, and more, will eventually be needed in Tuolumne, Calaveras, San Joaquin and Stanislaus Counties (RT 145-147, 1131). These four counties include substantial areas in the Stanislaus River basin and are considered by the Bureau to be entitled to preference in the use of project water, based on the provisions of Public Law 87-874 and the California County of Origin Law (Water Code Sec. 10505) (RT 144). The Board agrees, as explained later in this decision
 "The limited unappropriated water resource of the State should not be committed to an applicant in the absence of a showing of his actual need for the water within a reasonable time in the future. When the evidence indicates, as it does here, that an applicant already has a right to sufficient water to meet his needs for beneficial use within the foreseeable future, rights to additional water should be withheld and that water should be reserved for other beneficial uses. In this case, existing surplus supplies that are available to the Bureau should be utilized before storage is allowed in New Melones Reservoir to satisfy demand for more water in service areas outside of the four basin counties.
 "Although the full conservation yield of the project will be required for future development of the four basin counties, no facilities have been planned up to now to serve project water in these counties and no contracts have been negotiated for such service. The record is not clear how soon water user agencies will be ready to execute any such contracts.
 "The lack of evidence that New Melones Project water will be needed for consumptive use outside the four basin counties for many years to come, if ever, or that it will be used within those counties at any definite time in the future, raises substantial doubt whether permits should be issued to impound more water in New Melones Reservoir, at least at this time, than is needed for satisfaction of prior rights and non-consumptive purposes-protection and enhancement of fish and wildlife, water quality, recreation and generation of power.*
 "* Permits to impound water for flood control are not required and were not requested." Brief for Defendant-Intervenors County of Calaveras, App. A at 16-17, Decision 1422, State Water Resources Control Board.
 
 
 [12]
 "[B]efore initiating any diversion of water from the Stanislaus River Basin in connection with the operation of the Central Valley Project, the Secretary of the Interior shall determine the quantity of water required to satisfy all existing and anticipated future needs within that basin, and the diversion shall at all times be subordinate to the quantities so determined." 76 Stat. 1163, 1191
 
 
 [13]
 We do not read the National Environmental Protection Act to give to the courts the ultimate authority to approve or disapprove construction of a properly authorized project where an adequate EIS has been prepared and circulated in accordance with the NEPA requirements. There has been some uncertainty in the views of other courts upon this issue. Compare Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 786-787 (D.C.Cir.1971), with Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 297 (8th Cir. 1972). See also Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (D.C.Cir.1972); City of New York v. United States, 344 F.Supp. 929, 940 (E.D.N.Y.1972); Hanly v. Kleindienst, 471 F.2d 823, 840 (5th Cir. 1972) (Friendly, J. dissenting). We have taken the view that final judgments of project justification are not subject to review in an action to consider the adequacy of an EIS statement under NEPA. Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1276, 1279-1280 (9th Cir. 1973). Congress in reauthorizing the project and in determining whether to proceed in the light of the EIS must consider many other factors in addition to the environmental effects. Those questions are not before us and properly so