**PEOPLE OF the STATE OF CALIFORNIA ex rel. Evelle J. YOUNGER, Attorney General, and California Coastal Zone Conservation Commission, Plaintiffs,**

v.

**Rogers C. B. MORTON, in his official capacity as Secretary of the Department of the Interior, et al., Defendants.**

**No. CV 74-2374-DWW.**

United States District Court, C. D. California.

Nov. 17, 1975.

Evelle J. Younger, Atty. Gen., Robert H. O'Brien, Carl Boronkay, Asst. Attys. Gen., Nicholas C. Yost, Norman N. Flette, John P. Meck, Deputy Attys. Gen., Los Angeles, Cal., for plaintiffs.

William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., Donald J. Merriman, Asst. U. S. Atty., Los Angeles, Cal., William M. Cohen, Atty., Land & Natural Resources Div., Washington, D. C., for defendants; Gary Bohlke, Jack Hughes, Attys., Dept. of the Interior, Washington, D. C., of counsel.

## MEMORANDUM OPINION

DAVID W. WILLIAMS, District Judge.

The energy crunch in the United States which resulted from the slackening of Mid-East oil sources in 1973 caused a revival of attention to undersea petroleum deposits which had long been assumed to exist in respectable quantities. The Department of the Interior (DOI) recommended to the President of the United States that consideration be given to the stepping-up of plans to lease acreage in the Outer Continental Shelf (OCS) to private drillers.[1] Subsequently, President Nixon delivered his "Energy Message" to the nation on April 18, 1973, a portion of which dealt with OCS leasing. Later the President announced "Project Independence" which was designed to accelerate offshore leasing and exploration so as to hopefully meet America's energy needs by 1980. DOI hastened its feasibility studies in several offshore areas, including that off the coast of Southern Cali-

---

1. The Secretary of the Interior has power to negotiate such leases pursuant to Section 8 of the Submerged Lands Act, 43 U.S.C. § 1337.

fornia, and industry was invited to make nominations of fields which their experts felt would provide the greatest drilling potential. Alarmed by the spectre of another Santa Barbara blowout,[2] conservationist groups provided a chorus of protests to the resumption of any drilling to the Southern California offshore drilling. This lawsuit seeks to enjoin, or at least delay, the leasing of those offshore areas. In this action, the State Attorney General on behalf of the People of California and the Coastal Zone Conservation Commission seeks to frustrate the clear intention of the Secretary of the Interior to designate certain fields on the outer Continental Shelf to lease for development. This Court has jurisdiction to hear the controversy pursuant to 43 U.S.C. § 1333(b).

Dwindling domestic sources of oil and gas pose a definite threat to the American consumer and to industry. It is clearly in the national interest and in the interest of defense of the United States that our dependence on imported oil be minimized. Experts predict that on-shore drilling will not meet all our needs, and there is a great groundswell of demand to allow and even assist private industry discover the location and extent of submerged pools of oil and to develop new techniques of safely delivering this product to the surface. There is near-certainty that oil exists in the outer Continental Shelf, but drillers encounter at least the same problems that they encounter in land drilling—where to drill and how much to expect? Plaintiffs argue alternately that there is no certainty that oil in rewarding quantities exist off the Southern California shore, and even if it does, the DOI should first go elsewhere to begin an exploration program which carries such a high risk to the environment.

We start with knowledge that the Secretary of the Interior's power to lease offshore acreage for development is contingent upon close adherence to the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. Section 102 of the Act in pertinent part provides that

" . . . (2) all agencies of the Federal Government shall— * * * (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

The detailed statement referred to in the Act is known as an Environmental Impact Study (EIS) and it should precede the effective commencement of any governmental project which might adversely affect the environment. There is no doubt that governmental action of offering lease interests in California offshore lands (Lease 35) by DOI is an act which poses grave danger to the environment. The very existence of unattractive floating platforms to support drilling activities is a menace to visual sensitivities. Worse, the art of drilling, laying lines, and forcing the oil

2. In 1969 a private oil production company sustained an accidental rupture of its lines while engaged in platform drilling off the coast of Santa Barbara and millions of gallons of oil escaped into the water and converged upon shore in a foul mass, killing an untold number of sea organisms, fish and birds and causing much property damage. Irate citizens redoubled their efforts to convince authorities that there should be no further exploration of submerged oil deposits.

and gas to surface is so unperfected that oil leaks are frequent, and gigantic spills which might match or exceed the Santa Barbara incident are ominously possible. This, then, is a highly volatile political question of powerful competing public policies—the need of energy versus environmental concerns.

Plaintiffs do not attempt to argue that the United States does not face an energy crisis. Rather, theirs is an urging to use some other frontier for undersea experimentation and to come to California's shores only when a fail-safe process has emerged. This short-sightedness fails to take into account the great developmental strides that have brought to the oil industry practiced techniques in platform drilling and improved methods of oil capture.

The Secretary of the Interior has set December 11, 1975 as the date to begin definite negotiations with oil companies for the leasing of tracts he has defined. This identification of lease tracts has come after governmental experts as well as oil company geologists and engineers have sorted over available beds and made choices known. The law mandates that the Secretary shall take no such action until his final EIS demonstrates that his agency has fully considered the impact of the action on the environment, possible alternatives, and irreversible or irretrievable effects brought about by drilling.

The DOI follows certain established procedures in the process of considering proposed OCS oil and gas lease sales. After technical reports are made by the Bureau of Land Management on a proposed leasing area, calls are made to industry to nominate tracts. Requests are then made for comments on the lease proposal from all interested groups, including state and local governmental entities. Then tentative tract selections are adopted and public announcement of this is made.

A draft EIS is prepared for a potential sale and public hearings are held to provide state and local govern-ment agencies and the public to submit comments on the proposal and the draft EIS. Then a final EIS is prepared and published which includes and reflects the materials gathered at public hearings. All of this precedes a final decision of the Secretary to hold a sale. If the agency decides that a lease sale shall be held, a notice is published in the *Federal Register* identifying the tracts to be offered and stating the lease terms. This procedure complies with the demands of § 102 of NEPA and was substantially followed in the events that led to a decision to sell in Lease 35.

Two EIS's have been filed by the DOI —a Program Report and a Site Specific Report, 8 volumes of over 6000 pages. These were compiled with the help of governmental experts in several fields and an independent team of experts designated by Massachusetts Institute of Technology. These studies discuss offshore leasing in all possible areas in coastal waters of the United States, including the Gulf of Mexico, the Atlantic coast, the Gulf of Alaska as well as the California coast. There is discussion of energy courses alternative to offshore leasing including development of onshore oil and gas resources, oil shale, geothermal energy, solar energy—and the alternative of no submerged drilling at all. The Site Specific Report takes full recognition of the 1969 Santa Barbara accident, but reports the measures that are available to lessen the danger of a repetition of that incident, including safety precautions and inspections which would condition any permission to explore.

Prior to the completion of these reports the agency notified the public and interested conservationist groups of its studies and comments were invited. Public hearings were held where full opportunity was given hostile groups as well as state and local governmental entities (and other federal agencies) to criticize the studies and present adverse ideas. Having been presented with these opposing views, the Secretary has made no modification of the depart-

ment's original plan, but indicates an intention to go forward with Lease 35.

Plaintiffs contend that the DOI has failed to comply with NEPA because, in plaintiff's view, that Act calls upon defendants to prepare an impact study before the taking of any step in the direction of final action. Plaintiffs would compel the Secretary to prepare an EIS before recommending lease acceleration to the President of the United States; before identifying any part of the Southern California coast as a possible target of exploration and before applying to Congress for funds to finance a leasing program.

■ This Court must reject the argument that such a step by step impact study is called for by NEPA, *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (fn. 20) (1975). Such a requirement would, in such a case as this, unduly fetter early investigative stages of DOI aimed only at testing possible feasibility of the program. This period is needed to collect the impressions of geologists and engineers as to the possible success of such a project; to calculate the cost of a full blown program; to measure the responses that might be expected to come from potential lessees and to find what possible consequences offshore drilling would have upon other governmental operations—such as defense, the Coast Guard and private shipping.

This circuit has said of NEPA that:

"Neither § 102(2)(B) nor (C) can be read as a requirement that complete information concerning the environmental impact of a project must be obtained before action may be taken. If we were to impose a requirement that an impact statement can never be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated."

*Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1280 (9th Cir. 1973).

I conclude that DOI's recommendation to President Nixon to accelerate OCS's leasing and the President's directive to do so; the DOI's publication of leasing schedules, and the making of appropriation requests and the inviting of nominations of acreages from industry were necessary preliminary activities possibly leading to a lease sale but which did not have to be preceded by an impact study of the type required by § 102. It was in appropriate compliance with that section for the Secretary to time the completion of a final statement so as just to precede his final decision whether there should be a sale.

Now that the Secretary has filed a § 102 impact study following invited comment and public hearings, plaintiffs would stay implementation of the final decision to lease upon the ground that the EIS's were based upon inadequate data. Plaintiff argues that the filed reports are founded upon unknown factors and variables.

■ Plaintiff's expert witness contends that the program EIS which assesses the accelerated leasing goal should, but does not (a) formulate or discuss a leasing schedule according to net benefit criteria or any reasonable criteria, or, (b) discuss and describe reasonable alternative leasing schedules according to any reasonable criteria. Plaintiff argues that in evaluating the commercial exploitation of any national resource, it is necessary to consider the distribution of costs and benefits as well as the total value. This is based upon the principle that no locality should bear more of the cost than accrues to it as a benefit. Plaintiff would compel the design of a plan which would not allow one region to suffer damage to its environment in a process which would allow other regions to benefit from the captured natural resource. They argue that the cost as well as the benefits should be shared nationally. Such an argument conflicts with the socio-economic pattern upon which this nation

is based and which necessitates some areas bearing the burden and costs of industrialization, farming, electric power generation, coal and iron production that is transported to other areas of the country for their benefit.

A recent case in this circuit deals with plaintiff's argument that the EIS should analyze costs against benefits to be derived.

"Notwithstanding this evaluation of reasonably related alternatives and the conclusion of the EIS that the project's benefits exceed its costs, the appellants insist that the EIS is inadequate because it does not contain a formal and mathematically expressed cost-benefit analysis. We do not believe such an analysis is necessary to enable an EIS to serve the purposes for which it is designed.

This conclusion rests upon the hard fact that there is sufficient disagreement about how environmental amenities should be valued to permit any value so assigned to be challenged on the grounds of its subjectivity. It follows that in most, if not all, projects the ultimate decision to proceed with the projects, whether made by Congress or an agency, is not strictly a mathematical determination. Public affairs defy the control that precise quantification of its issues would impose.

This is not to say that progress is not being made in devising techniques which will make cost-benefit analysis more reliable. Nor is it to say that under no circumstances should the EIS contain a numerically expressed cost-benefit analysis. We intend merely to say that under the circumstances of this case the absence of such an analysis in the EIS is not fatal. The EIS before us is sufficiently detailed to aid the decision-makers in deciding whether to proceed or not and to provide the information the public needs to enable both those who would challenge, and those who would support, the project to respond effec-tively. No controlling authority brought to our attention forecloses this determination. We would be less confident that these purposes have been achieved were it not clear from the record of this case that this project has undergone a cost-benefit analysis because of its status as a reclamation project. As it is, we consider the EIS adequate." *Trout Unlimited et al. v. Morton,* 509 F.2d 1276, 1286 (9th Cir. 1975).

## STANDARD OF REVIEW

Plaintiff's entire argument is a plea for this Court to involve itself into a political policy-making question. The question whether to proceed with the acceleration of OCS lease sales is one for the DOI to decide after properly evaluating the impact of the project upon the environment. It is not intended that this Court serve as a critic of the EIS that is properly prepared. *The Environmental Defense Fund v. Armstrong,* 487 F.2d 814, 822, fn. 13 (9th Cir., 1973). Judicial power of review in an instance of this nature is within narrow confines. The Administrative Procedure Act, 5 U.S.C. § 706, permits a reviewing court to hold unlawful the action of a federal agency if its findings and conclusions are found to be— "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (D) without observance of procedure required by law." This Court cannot substitute its judgment for that of the agency unless I find the action taken by DOI to be arbitrary and capricious and I do not. *Citizens to Preserve Overton Park v. Volpe,* 401 U. S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

NEPA is a procedural statute designed to make federal agencies mindful of the manner and the extent to which their decisions may have impact upon environmental factors, and guidelines are provided which must be followed by the decision-makers. If it is shown that the agency failed to follow

the correct procedures, or that in presenting an EIS it offered a shallow, purposely evasive and incomprehensive report which clearly lacked good faith statutory compliance, this Court could under subsection (D) of § 706 declare the action to be unlawful. *Lathan v. Brinegar,* 506 F.2d 677, 692 (9th Cir., 1974); *Trout Unlimited v. Morton,* supra; *Life of the Land v. Brinegar,* 485 F.2d 460, 469 (9th Cir., 1973).

I have reviewed the voluminous EIS's filed by DOI and find them to be comprehensive and analytical and in full compliance with § 102 of NEPA. The relief prayed for by plaintiffs is denied and the action is ordered dismissed.