Anne **BURLEIGH**, for herself and as Chairman of the Natatorium Preservation Committee, a non-profit association, et al., Plaintiffs,

v.

Howard **CALLOWAY**, Individually and as Secretary of the United States Army, et al., Defendants.

Civ. No. 73–3846.

United States District Court, D. Hawaii.

Aug. 1, 1973.

---

Fred W. Rohlfing, Honolulu, Hawaii, for plaintiffs.

Harold M. Fong, U. S. Atty., William C. McCorriston, Asst. U. S. Atty., Honolulu, Hawaii, for defendants Calloway and Edelstein.

George Pai, Atty. Gen. of Hawaii, Melvin Nishimoto, Asst. Atty. Gen., Honolulu, Hawaii, for defendants Burns, Wright and Marland.

Richard K. Sharpless, Corp. Counsel, Gaylord A. Virden, Deputy Corp. Counsel, City and County of Honolulu, Honolulu, Hawaii, for defendant Fasi.

## MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION

PENCE, Chief Judge.

This action brought by personally concerned citizens and community groups under the National Environmental Policy Act of 1969 (NEPA), 42 U.S. C. 4331, et seq., seeks to enjoin all acts in furtherance of the Waikiki Beach Erosion Control Project which might demolish the Hawaii war memorial known as the Natatorium. The Waikiki Beach Erosion Control Project is state and federally funded and is the responsibility of the Army Corps of Engineers. Its purpose is to improve the "Waikiki beach" by (a) increasing beach land, (b) improving access to the shoreline, and (c) preventing future beach sand erosion. The segment of the overall project to which the Corps' final Environmental Impact Statement (EIS) and its Supplement apply, runs from the Kapahulu Storm Drain to the Elks Club. Planned improvements in this segment consist of construction of three new groins, placement of approximately 46,000 cubic yards of sand, and demolition of the Natatorium.

The Natatorium is a state-owned facility, constructed in 1921 as a war memorial honoring Hawaii citizens who served in World War I. It consists of a cannon and memorial plaque, a unique salt water pool perhaps the largest of its kind in the world, and other inconse-

quential recreational facilities. In its very early years the Natatorium was the site of world championship-level swimming meets. Although initially (1972) bypassed by the Hawaii Historic Places Review Board, the Natatorium was placed in the State Register of Historic Places *after* the final EIS was filed, and the Supplement to the EIS directs itself to that action.

Plaintiffs allege that destruction of the Natatorium violates both federal and state law and have sought this court to accept pendant jurisdiction over its state claims. In the court's view, however, sound principles of federalism make it highly inadvisable for a federal court to consider enjoining construction of major state building projects in reliance on state grounds which may be as easily asserted in state courts. Accordingly, at oral argument, this court limited both debate and the scope of consideration to the sole substantial federal issue raised: whether the substantive and procedural requirements of NEPA had been met by the Corps.

Plaintiffs urge that the EIS and Supplement are insufficient to comply with NEPA in the following particulars:

1. Inadequate study and description of alternatives to the destruction of the Natatorium.

2. Failure to prepare a cost benefit analysis on the alternative of incorporating restoration of the Natatorium into the project.

3. Failure to disclose the full range of environmental impacts of the proposed project.

An analysis of the EIS and major objections shows:

*Development and Description of Alternatives to the Natatorium's Destruction.*

At the threshold there is some question whether the policies of NEPA require consideration of alternatives to the Natatorium's destruction. Notwithstanding its recent designation as a State Historical Place, it is questionable whether it is an "important historic . . . aspect of our national heritage" within the purview of 42 U.S.C. § 4331 (b)(4). Further, the Natatorium could reasonably be viewed as more of an environmental detriment than resource. It has been in a disreputable state of disrepair for many years. The estimated cost of restoration was $700,000 to $1,000,000 in 1965. Governor Burns has characterized it as "no longer a proud memorial", further adding that "a new beach, properly landscaped and dedicated for the purpose will constitute a more suitable and living memorial." As the EIC notes, it is unlikely that state or city funds would be available for rehabilitation. The city of Honolulu now even insists that the state would be entirely responsible for its restoration—and wants no part of the Natatorium. Present state and city administrations favor its demolition. Past administrations have allowed the continued deterioration of the Natatorium to go unattended and unstopped.

In any event, however, the EIS carefully considered the alternative of incorporating restoration of the Natatorium into the project. The court notes that this has led to plans incorporating into the project the preservation of the memorial plaque and cannon. The historical and ecological significance of destruction vis-à-vis restoration have been carefully analyzed by the Corps. There is, however, no analysis, cost benefit or otherwise, of the economic or technical feasibility of any specific plan incorporating a restored structure. In the instant case the court views such an analysis unnecessary. NEPA requires specific consideration of reasonable alternatives but it does not mandate detailed economic (*i.e.*, cost benefit) and technical analysis of alternatives determined to be unreasonable on the basis of well analyzed considerations having nothing to do with economic or technical

**124**

feasibility.[1] The clearly controlling factors in the decision to demolish the Natatorium were (a) the dominating need articulated by the State of Hawaii and the City and County of Honolulu for more beach land, (b) the fact that any alternative incorporating preservation of the Natatorium would provide less than half of the additional beach land envisioned in the proposed plan, and (c) both the state and city wanted the memorial demolished.

*Disclosure of the Full Range of Environmental Impacts of the Proposed Project*

 Plaintiffs' expert testimony (including affidavits) simply does not support their position that significant adverse environmental consequences of the project were either omitted or inadequately explored in the EIS. Such evidence was largely directed towards suggesting alternatives believed by those experts to be more effective at solving the very same environmental problems of sand erosion and inadequate beach space to which the project itself is entirely directed.[2] Such testimony would be material if NEPA empowered federal courts to resolve technical engineering controversies over which one of several construction proposals might contribute the greatest good to the environment. NEPA, of course, does no such thing.[3] The act sets forth a strong statement of national policy to be rigorously applied, but under it federal courts can do no more than require that its procedures be followed and that exploration and consideration of environmental factors be an integral part of the decision making process in the formulation of federal and federal-participation construction projects. In the instant case that has been done by the Corps.

## CONCLUSION

For the above-mentioned reasons, plaintiffs' motion for preliminary injunction is denied.

In line with Judge King's concern over the matter of securing sand for the project, and its possible environmental effect on the area from which sand is borrowed, this court reserves consideration of the aspect of sand procurement until such time as it might hereafter arise.

---

1. Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 167 (D.C. D.C.1971) aff'd, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972). It should be noted that although the EIS contains no economic analysis of restoration, the Corps of Engineers did conduct such a study and also made use of the 1965 detailed report by Wolbrink and Associates commissioned by the City and County of Honolulu which described in depth the costs of complete and various partial restorations.

2. Dr. Gerritsen did testify for plaintiffs that the preservation of the Natatorium could be fitted into a beach improvement plan. Nonetheless, he also suggests that destruction of the Natatorium best serves environmental ends. In his view, filling the offshore dredged channel would protect against future beach sand erosion. The maximum advisable filling of the channel (contemplated in the project plan) requires destruction of the Natatorium.

3. Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F. 2d 783, 786-787 (1971).