**BUCKS COUNTY BOARD OF COMMIS-SIONERS and Bucks County Planning Commission and Stops**

**v.**

**INTERSTATE ENERGY COMPANY and Delaware River Basin Commission.**

Civ. A. No. 74–2758.

United States District Court,
E. D. Pennsylvania.

Nov. 17, 1975.

Lawrence Sager, Pottstown, Pa., for plaintiffs.

Peter Platten, Philadelphia, Pa., for Interstate.

William Miller, Princeton, N. J., for Basin Commission.

## OPINION

LUONGO, District Judge.

This is an action brought under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA), seeking to enjoin construction of an oil bearing pipeline. Plaintiffs are the Bucks County Board of Commissioners, the Bucks County Planning Commission and Stop the Oil Pipeline Society (STOPS), an unincorporated association. Defendants are Interstate Energy Company (Interstate), a public utility corporation doing business in Pennsylvania, and the Delaware River, Basin Commission (Basin Commission). A brief history of the case follows:

## BACKGROUND

Interstate proposes to construct 83 miles of 18 inch pipeline running north from the Marcus Hook terminal on the lower Delaware River, to the Martins Creek Generating Station of Pennsylvania Power and Light Company, near Easton, Pennsylvania, for the transportation of boiler fuel oil. Included in the project is a ten mile "lateral breakout," an eight inch pipeline running east from the main branch to the Gilbert Generating Station owned by Jersey Central Power and Light Company, in New Jersey. Pursuant to Pennsylvania law,[1] plans for the pipeline were submitted to the Pennsylvania Public Utility Commission (PUC) for review. On February 6, 1973, following 18 days of hearings in

---

1. Section 102 of the Public Utility Law, 66 P.S. § 1121 (1963).

which the plaintiffs participated, PUC entered an order approving [2] the project. That order was appealed and on December 12, 1973, the Pennsylvania Commonwealth Court unanimously affirmed the PUC decision.[3]

Basin Commission was created by the Delaware River Basin Compact in 1961 (P.L. 87–328). It is required by the Compact to formulate a comprehensive plan and to review against this plan any project which would substantially affect the water resources of the basin.[4] In addition, it is the federal agency designated to implement NEPA for all projects affecting the Delaware River Basin.

On April 12, 1972, before the PUC hearings had commenced, Basin Commission advised Interstate that the proposed project "significantly affected the quality of the human environment" and that Basin Commission, pursuant to NEPA, was required to prepare an Environmental Impact Statement (EIS).[5] Approximately one year later (April 16, 1973), and after PUC approval had been granted to Interstate, Basin Commission participated in a public informational hearing sponsored by the residents of Springtown, Pennsylvania, concerning the project. Shortly after that public hearing, on April 18, 1973, Interstate filed its application for Basin Commission's approval of the pipeline. That application included an environmental report containing data designed to assist Basin Commission in making an environmental analysis of the project and to assist it in its preparation of the EIS. The report was made available by the Basin Commission to all interested parties, including plaintiffs.

On June 28, 1973, after notice to all parties, Basin Commission held a public hearing in Montgomery County designed to "provide information to the public and to receive information from citizens that may be useful to the Commission in reviewing the impact of the proposal." [6] On January 14, 1974, Basin Commission, pursuant to § 102(2)(C) (42 U.S.C. § 4332(2)(C)), issued a Draft Environmental Impact Statement and forwarded copies to the plaintiffs and 25 federal agencies for comment. On February 26, 1974, again after published notice, there was a second public hearing at which oral and written comments were solicited from the plaintiffs and other participants to aid in revision of the Draft.[7]

On June 28, 1974, Basin Commission released its final Environmental Impact Statement concluding that the transmission of low sulphur fuel oil for the generation of electric power would have "an overall beneficial effect on the quality of the human environment." (EIS p. C–1) Thereafter, plaintiffs filed objections to

2. For a detailed analysis of these hearings, see Pennsylvania Public Utility Commission Order No. 97032 and Pennsylvania Public Utility Commission Certificate of Public Convenience No. A 97032.

3. *Bucks County Board of Commissioners v. Commonwealth Public Utility Comm.*, 11 Comm.Ct. 487 (1973). Petition for Reargument denied January 8, 1974. Petition for Allowance of Appeal denied per curiam by the Pennsylvania Supreme Court on May 16, 1974, Case No. 1304.

4. Section 3.8 of the Compact provides in part:
   "No project having a substantial effect on the water resources of the basin shall hereafter be undertaken by any person, corporation or governmental authority unless it shall have been first submitted to and approved by the commission . . . ."

5. Section 102(2)(C) (42 U.S.C. § 4332(2)(C)) of NEPA requires that federal agencies prepare an EIS on all major federal actions affecting the environment. The Commission deemed its review of the proposed crossing of 28 significant streams with a pipeline operating at pressures of over 150 psi to be a major federal action.

6. Basin Commission's notice of "Public Information Meeting."

7. These hearings were held under § 13.1 of the Compact which requires the Basin Commission to hold a hearing whenever the Comprehensive Plan is to be revised. Due to the project's size and the public interest it generated, Basin Commission contemplated a revision in the Plan to include the pipeline.

Interstate's application and requested an adversary hearing. Under the Basin Commission's Rules of Practice and Procedure[8] an objector is entitled to such a hearing only if the executive director deems the objections to be substantial. After review, the executive director denied the request for a hearing on the ground that no substantial objection had been made.

On September 25, 1974, Basin Commission approved the pipeline for inclusion in its Comprehensive Plan for the Delaware River Basin.[9] On October 22, 1974, plaintiffs filed this complaint seeking to review Basin Commission's decision, seeking to enjoin construction of the pipeline, and asking for a declaration that the Basin Commission's regulations, policies, and procedures are unconstitutional and violative of plaintiffs' civil rights. Plaintiffs charge that Basin Commission (A) failed to observe NEPA standards for the preparation and review of the EIS; and (B) failed to hold public adversary hearings in violation of NEPA and Basin Commission's own procedures.

From the outset, the defendants have maintained that this court lacks jurisdiction, and that this litigation should be disposed of on questions of law without a trial. Accordingly, defendants filed motions for summary judgment. Out of an abundance of caution, I refused to grant defendants' motions and instead ordered the matter to proceed to trial to afford plaintiffs the opportunity to present testimony as to any and all potential material issues of fact. The evidence presented at the trial added little of substance to the record which had already been created on the motions for summary judgment. To the extent that under Rule 52, F.R.Civ.P., findings of fact are required, they will be incorporated in the text of the opinion discussing the applicable law.

8. Sections 2–3.10, 2–3.11.

# DISCUSSION

## I. JURISDICTION

Defendants have raised serious questions concerning jurisdiction and for this reason I will examine each of plaintiffs' jurisdictional claims.

Plaintiffs' complaint cited the following statutes as jurisdictional bases for this action: the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; the Mandamus Statute, 28 U.S.C. § 1361; the Administrative Procedure Act, 5 U.S.C. §§ 701–706; the Federal Question Statute, 28 U.S.C. § 1331; and the National Environmental Policy Act of 1969.

### Declaratory Judgment Act

The Supreme Court has ruled in several decisions that the Declaratory Judgment Act "is not an independent source of federal jurisdiction" and cannot confer jurisdiction where it is otherwise lacking. *Schilling v. Rogers,* 363 U.S. 666, 677, 80 S.Ct. 1288, 1296, 4 L.Ed. 2d 1478 (1960). It is "procedural only" and does not enlarge or modify the "limited subject matter which alone Congress [has] authorized the District Courts to adjudicate . . ." *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). Also see *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Standing alone, therefore, the Declaratory Judgment Act does not confer jurisdiction.

### Mandamus Statute

Plaintiffs' claim of jurisdiction under the mandamus statute also fails since mandamus will issue only where an officer or employee of the federal government owes the plaintiffs a "legal duty which is a specific, plain ministerial act 'devoid of the exercise of judgment or discretion.'" (Citations omitted) *Richardson v. United States,* 465 F.2d 844, 849 (3d Cir. 1972), *cert. denied,* 410 U.

9. See Notice of Commission Action, September 27, 1974, Docket No. D–71–109 C P approving the September 25, 1974 action.

S. 955, 93 S.Ct. 1420, 35 L.Ed.2d 688 (1973). As the Third Circuit noted in *Richardson, supra*:

"An act is ministerial only when its performance is positively commanded and so plainly prescribed as to be free from doubt."

It is clear that Interstate is not an officer or an employee of the United States and therefore does not come under this statute. It is equally clear that the duty which plaintiffs charge Basin Commission breached was neither ministerial nor clearly prescribed. Plaintiffs do not contend, for example, that Basin Commission failed to prepare an EIS, a task specifically required by NEPA, but rather that Basin Commission's conclusions as to the environmental impacts of the proposal are inconsistent with their own. Though NEPA (42 U.S.C. § 4332(B)) calls for all agencies of the government to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking . . .," it provides no defined standard of evaluation; the exact method of analysis used to accomplish this goal is left to the judgment of the particular agency. Basin Commission, drawing on its own expertise in the field of water resources, considered those competing environmental impacts it deemed significant and assigned them various degrees of importance in the decisionmaking process. Plaintiffs would have evaluated these factors differently and in effect ask that Basin Commission be ordered tu comply with what the plaintiffs believe to be the "correct" standard. This is not the exercise of a ministerial act and is not, therefore, a proper subject for mandamus.

### Administrative Procedure Act

The Court of Appeals for the Third Circuit has held that the Administrative Procedure Act does not confer independent jurisdiction upon the federal courts to review agency action. In *Operating Engineers Local 542 v. NLRB*, 328 F.2d 850, 854 (3d Cir.), *cert. denied*, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964), the Court held

"There is nothing in . . . the Act which extends the jurisdiction of either the district courts or the appellate courts to cases not otherwise within their competence. [Citations omitted] The Act is clearly remedial and not jurisdictional."

*Accord, Zimmerman v. United States Gov't*, 422 F.2d 326 (3d Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2200, 26 L. Ed.2d 565 (1970); *Getty Oil Co. v. Ruckelshaus*, 467 F.2d 349 (3d Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973); *Raitport v. National Bureau of Standards*, 378 F.Supp. 380 (E.D.Pa.1974).

### Federal Question

Federal question jurisdiction under 28 U.S.C. § 1331 requires that there be at least $10,000 in controversy. The complaint alleged that several members of STOPS own property which is to be traversed by the pipeline, but there was no allegation as to the amount of damage to any individual plaintiff. That deficiency might have been cured by an appropriate amendment to the pleadings, and jurisdiction might have been conferred by such amendment. The matter, however, proceeded to trial with no attempt by plaintiffs to amend to allege the requisite jurisdictional amount (and indeed there was a total failure to prove any specific amount of damage to any individual member), consequently jurisdiction cannot be predicated upon 28 U.S.C. § 1331.

### National Environmental Policy Act

Finally, plaintiffs contend that NEPA itself confers jurisdiction. Unlike the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), and the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(3), for example, in which Congress specifically provided for federal jurisdiction without regard to the amount in controversy, NEPA contains no specific grant of jurisdiction. Nevertheless, some courts, without articulation of rea-

sons, have assumed that NEPA furnishes an independent basis for jurisdiction in the federal courts. *National Helium Corporation v. Morton,* 486 F.2d 995 (10th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *City of North Miami, Florida v. Train,* 377 F.Supp. 1264 (S.D.Fla. 1974); and *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D. C. 380, 463 F.2d 783 (1971); *Cf. Borough of Morrisville v. Delaware River Basin Commission,* 382 F.Supp. 543 (E. D.Pa.1974). One of those cases, *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C.* 380, 463 F.2d 783 (1971), has, in turn, been relied upon by other courts as authority that NEPA furnishes an independent basis for jurisdiction. See *Students Challenging Regulatory Agency Procedures (S.C.RA.P.) v. United States,* 346 F. Supp. 189, 197 (D.C.D.C.1972), *reversed on other grounds,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (hereinafter SCRAP I); *Students Challenging Regulatory Agency Procedures (S.C.R. A.P.) v. United States,* 371 F.Supp. 1291, 1298 (D.C.D.C.1974), *reversed on other grounds sub nom., Aberdeen and Rockfish R. R. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.),* 419 U.S. 822, 95 S.Ct. 38, 42 L.Ed.2d 46 (1975) (hereinafter SCRAP II).

The three-judge court in SCRAP I issued an injunction prohibiting the Interstate Commerce Commission from permitting railroads to collect a surcharge on recyclable goods. The district court cited *Committee for Nuclear Responsibility, supra,* as holding that the federal courts have jurisdiction to determine if the procedural requirements of NEPA were followed. SCRAP I, *supra* at 197. The case went on direct appeal to the Supreme Court which, in reversing the lower court, ruled that Congress under 49 U.S.C. § 15(7) had vested exclusive jurisdiction in the Interstate Commerce Commission concerning shipping rates. Though the Supreme Court noted the district court's reliance on *Committee for Nuclear Responsibility, supra,* it offered no comment as to the correctness of the holding, since the question of injunctive power under 49 U.S.C. § 15(7) was deemed dispositive of the issue.

In a second suit charging that the Interstate Commerce Commission violated NEPA (SCRAP II), the district court cited the Supreme Court's opinion in SCRAP I, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), as giving "implicit" approval to the assertion of jurisdiction (371 F.Supp. at 1298, note 22), noting that "[t]he Court did not suggest that NEPA was to be ignored by the courts in considering threshold jurisdictional issues." 371 F.Supp. at 1298.

█ In view of the "bootstrap" reasoning in those cases, there is room for doubt that NEPA is an independent source of jurisdiction, but in the absence of compelling authority to the contrary, I will, albeit with reservations, follow the above mentioned cases and conclude that NEPA does confer jurisdiction.

## II. MERITS

NEPA was enacted:

"To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." Congressional Declaration of Purpose, 42 U.S.C. § 4321.

The substantive environmental policy of the Act is set forth in § 101, subsections (a) and (b) (42 U.S.C. § 4331(a) and (b)), which provide that "it is the continuing responsibility of the Federal Government to use all practicable means" to "assure for all Americans safe, healthful . . . and culturally pleasing surroundings," "attain the widest range of beneficial uses of the environment without degradation, [or] risk to health or safety," "preserve important historic, cultural, and natural aspects of our national heritage," and

"achieve . . . a wide sharing of life's amenities." Section 101 permits broad exercise of agency discretion without requiring "particular substantive results in particular problematic instances." *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971).

Section 102 (42 U.S.C. § 4332), contains specific procedural directives designed to implement the policy declared in § 101. *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289, 294 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). Section 102(2)(C) (42 U.S.C. § 4332(2)(C)), requires preparation of an EIS containing "to the fullest extent possible" discussion and analysis of: (1) the environmental impact of the proposed project; (2) unavoidable adverse environmental effects; (3) possible alternatives to the project; (4) the relationship between short-term uses of the environment and the maintenance of long-term productivity; and (5) irreversible and irretrievable resource commitments involved in the project.

The "systematic" and "interdisciplinary approach" required by § 102(2)(A) (42 U.S.C. § 4332(2)(A)), serves several functions: it insures meaningful agency consideration of environmental factors; it provides evidence that the mandates of NEPA were in fact followed; it informs interested agencies and the public of the environmental consequences of planned federal action; and it gives the President, Congress, and other decision makers sufficient data from which to make an independent evaluation. See *Brooks v. Volpe,* 350 F.Supp. 269 (W.D.Wash. 1972), *aff'd,* 487 F.2d 1344 (9th Cir. 1973); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir. 1973). Also see *Calvert Cliffs' Coordinating Committee, Inc., supra; En-*

*vironmental Defense Fund v. Tennessee Valley Authority,* 339 F.Supp. 806 (E.D.Tenn.), *aff'd,* 468 F.2d 1164 (6th Cir. 1972); *National Resources Defense Council, Inc. v. Grant,* 341 F.Supp. 356 (E.D.N.C.1972); *Sierra Club v. Froehlke,* 359 F.Supp. 1289 (S.D.Tex. 1973), *rev'd on other grounds sub nom., Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974); *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973).

Agency action taken pursuant to the above outlined statutory provisions is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1966).[10] There is a split of authority as to the proper scope of review. Several circuits have adopted what is termed a "procedural" review standard. In those circuits, agency action is held unlawful and is set aside only when found to be "without observance of procedure required by law." § 706(2)(D). See *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir. 1974); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275, 1279–1280 (9th Cir. 1973). Also see *Environmental Defense Fund, Inc. v. Armstrong,* 487 F.2d 814, 822, n. 3 (9th Cir. 1973), *cert. denied,* 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974); *Upper Pecos Ass'n v. Stans,* 452 F.2d 1233, 1236 (10th Cir. 1971), *cert. granted,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 330 (1972), *vacated and remanded to determine mootness,* 409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972). The majority of circuits however, have adopted what is termed a "substantive" review standard. In these circuits, agency action is held unlawful and set aside when found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). However, as the Supreme Court cautioned in *Citizens to Preserve Overton*

---

10. See cases collected in *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1139 (5th Cir. 1974), and *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289, 299, n. 15 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); and Note, *The Least Adverse Alternative Approach to Substantive Review Under NEPA,* 88 Harv.L. Rev. 735, n. 2–3 (1975).

*Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971): ". . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

The Third Circuit has apparently not yet had occasion to decide which of the standards of review it will apply I need not decide this question since, under either standard of review, the defendants have complied with the requirements of NEPA.

### A. *Adequacy of Preparation and Review of the Final Environmental Impact Statement*

Plaintiffs' first claim is that Basin Commission failed to meet NEPA stand-

ards in the preparation of the final EIS. They contend that Basin Commission merely "rubber-stamped" Interstate's application to build a pipeline and undertook no meaningful review of the project, and that Basin Commission failed to do a cost-benefit analysis of the project thereby precluding a complete comparison of alternative methods of oil transport.

### (a) *Independent Review of the Project*

The EIS culminated twelve months of effort by Basin Commission in gathering, analyzing and evaluating pipeline information.[11]

The EIS is divided into eight main sections and contains twelve appendices,[12] fifty-one tables, forty-eight figures

11. The preface to the EIS notes how the informational process functioned:

*"Public Involvement—*

　　*　*　*　*　*　*

The DRBC approach to the preparation of an EIS includes meeting with opponents of the proposed project to obtain as much information as possible for determining any environmental impacts and for studying reasonable alternatives. This approach has caused considerable additional information imput to the preparation of the EIS. Every attempt has been made to evaluate all information received regardless of the source.

*Sources of Information—*The preparation of the EIS has included lengthy and extended reviews of all material received from the applicant. Indeed, the data and information received subsequent to the environmental re-

port far outweighs the original submission. Other sources for information have included the U.S. Departments of Interior, Commerce and Transportation, the U.S. Corps of Engineers, the Commonwealth of Pennsylvania, the Pennsylvania Utility Commission's public hearings, the planning commissions for the counties of Delaware, Chester, Montgomery, Bucks and Northampton (all in Pennsylvania), various local townships, numerous citizens and citizen organizations, and available literature references.

The applicants (sic) have employed numerous professional consultants including ground water experts, an architect, an historian and an archeologist to develop appropriate studies which, in several instances, have improved or mitigated environmental issues." (at p. ii)

12. The following appendices are attached to the EIS:

App. I 　"Strip Maps of Proposed Pipeline"

App. II 　"Profiles of Streams Crossed by the Proposed Pipeline"

App. XI 　"Method of Crossing Foreign Pipelines"

App. XII 　"Geologic and Hydrologic Studies of Gilbert Terminal Area"

App. XIII "Track Inspection of Belvidere and Delaware Branch of Penn Central Transportation Company in Mercer and Hunterdon Counties"

Appendices III through X originally in the draft EIS were deleted from the final EIS because of their bulk but were available for inspection at Basin Commission's headquarters.

App. III 　"Erosion and Sedimentation Control Plan"

App. IV 　"Pollution Incident Prevention Program"

App. V 　"Coal versus Oil for Electric Energy"

App. VI 　"Portions of 1970 Study Concerning Possible Pipeline Routes"

App. VII 　"Additional Information Concerning Pipeline Routes and Alternatives"

App. VIII Interstate Energy Company Historical Consultant's Reports

App. IX 　Historic Places and Landmarks in the Vicinity of the Proposed Pipeline

App. X 　Pennsylvania Public Utility Commission, Certificate of Public Convenience

**814**

and nine plates. The statement also contains a listing of oral and written comments and responses received directly and at the various hearings by Basin Commission. Basin Commission conducted field trips over the entire length of the pipeline and utilized experts in a wide range of disciplines whenever technical evaluations were required.[13]

The EIS discloses that Basin Commission considered each of the five areas of inquiry mandated by § 102(2)(C),[14] (42 U.S.C. § 4332(2)(C)). The Commission discussed, inter alia, the environmental impact of the project and included in its assessment the project's impact on natural, man-made, human and economic resources. It studied the unavoidable adverse environmental effects of the project; the possible alternatives to the project, including continued use of existing rail and truck transportation facilities; the relationship of the project to both the short-term use of the environment and its long-term productivity and the irreversible and irretrievable resource commitments involved in the project.

■ The EIS is a "detailed statement" evidencing an "interdisciplinary approach" to environmental considerations. Its stated conclusions are supported with objective factual data, in turn supported by numerous tables and footnoted references to scientific studies. In short, I conclude that, in preparing the EIS, Basin Commission complied with the procedural requirements of NEPA.

■ Similarly, Basin Commission's in depth study demonstrates that "all prac-

tical means" were used to "prevent damage to the environment," thereby fulfilling NEPA's substantive charge as well. Basin Commission carefully evaluated the need for the project and considered alternative ways to minimize any adverse environmental impacts caused by it.[15]

Nevertheless, plaintiffs contend that Basin Commission's failure to satisfactorily answer what they regard to be "substantial" objections demonstrates that significant environmental impacts were either not assessed or, if assessed, were considered superficially.

■ The sheer magnitude of this project makes improbable unanimity as to its benefits or adverse impacts. Achieving complete agreement among affected parties, however, although desirable, is not the function of the EIS. As the court in *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404, 412 (W.D.Va.), aff'd, 484 F.2d 453 (4th Cir. 1973), noted:

" . . . As is true with most endeavors, further study and analysis will produce a better document which is subject to less criticism. However, the purpose of an EIS is not to produce an objection free document, but rather to give Congress and other responsible agencies sufficient information on the project's environmental consequences with which to make an intelligent decision about whether or not to proceed with the project." [Citing *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (8th Cir. 1972), and *Environmental Defense Fund, Inc. v. Armstrong*, 352 F.

---

13. Basin Commission staff experts in the fields of geology, ground water, oil pipeline standards and safety, water quality and land planning evaluated and assessed the project. (EIS p. ii)

14. Seventy-five pages of the EIS are devoted to these areas.

15. The EIS notes:
"DRBC staff have played an important role in mitigating a number of potentially

adverse environmental impacts resulting from the proposed action. These are covered in depth in the EIS and include relocation of a pumping station with breakout tankage from a prime watershed area, relocation of the oil pipeline from an historic site having artifacts of value, redesign of a pumping station by an architect to conform with nearby structures, and special scheduling of stream and river crossings to reduce adverse impact to sensitive fish species." At p. iii.

Supp. 50 (N.D.Cal.1972), *aff'd*, 487 F.2d 814 (9th Cir. 1973), *cert. denied*, 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed. 2d 564 (1974)]

By way of illustration as to the adequacy of the EIS, I will discuss plaintiffs' main objection to the project which they raised both in their complaint and at trial.

Plaintiffs claim that various studies recommend rail transport as a superior alternative to construction of the pipeline. Basin Commission was aware of the rail alternative and the EIS, in compliance with § 102(2)(C)(iii) (42 U.S.C. § 4332(2)(C)(iii)) contains an analysis of this and other methods of oil shipment. Under subheading "Alternative Methods of Fuel Oil Transport," pipeline, rail and truck delivery are compared and evaluated. Additionally, the EIS contains a study of the track conditions of the proposed rail route to ascertain whether the existing rail facilities could safely handle the increased volume of traffic.[16] On the basis of this information the environmental impacts of each alternative on both the natural and human resources of the area were identified and considered.[17] After such consideration the EIS concluded that the adverse impacts from the use of the pipeline were less than from the use of rail.

In effect what plaintiffs seek in this litigation is a judicial evaluation of opposing scientific data. As the District of Columbia Circuit noted in *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971), "the court is not to·rule on the relative merits of competing scientific opinion." The EIS clearly sets forth the opposing scientific viewpoints [18] and this is sufficient to comply with the Act.

16. See Appendix XIII.

17. See Table A–2 in the EIS.

18. EIS, pp. A–6, A–7:
"An evaluation of the rail and pipeline system of fuel oil transport will indicate that they both will generate environmental impacts, for it is highly unlikely that such a product can be transported with no influence on the environment. For instance, the power required by both systems will result in air emissions from the use of locomotive or electric power for product movement. Both systems will also result in some degree of nuisance to the public because of maintenance and repair activities. More significant discussion will focus on the impacts of the pipeline that the choice of a rail alternative would eliminate, and the impact which may result if railway transport was the selected alternative.
Utilization of the railroad as an alternative method of fuel oil transport would avoid the following major impacts which would result from the proposed project:
1. The construction of the new pipeline would be avoided and therefore the environmental impacts resulting from that construction would not occur.
2. The environmental impacts of the operation and construction of the Intermediate Pumping Station and the Gilbert Terminal would be avoided.
3. No additional lands, now unrestricted by a utility right-of-way, would be restricted from placement of permanent structures or growth of timber. Any possible interference to future sub-surface utilities would be avoided at crossings of the proposed route.
4. Adverse impacts to most land use planning activities in the vicinity of the proposed route would be avoided.
5. Alleged changes in property values and taxation in the vicinity of the pipeline would not be applicable if the project were not constructed. [Footnote omitted]
6. Environmental impacts which could result from an emergency situation would be avoided in the vicinity of the proposed pipeline route.
. . . The major impacts which would result from use of the Penn Central railroad for the delivery of fuel oil, as compared to the proposed pipeline, are as follows:
1. A far larger population, in more densely inhabited areas along the railway route, would be exposed more frequently to the potential safety hazards from spillage of the product as well as fire and collisions at each grade crossing.
2. A nuisance and greater level of interference to the daily activities of the public would occur due to traffic interruption and visual and audible recognition of the transportation process.
3. The opportunity for spilled fuel oil to reach a waterway is greatly increased because 85 percent of the route closely parallels such waterways.
4. Expansion of this system to transport the ultimate requirements of the Martins Creek station would increase the degree to which these detrimental impacts occur."

"So long as the officials and agencies have taken the 'hard look' at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion . . . as to the choice of action to be taken." [Footnotes omitted] *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App. D.C. 5, 458 F.2d 827, 838 (1972)

■ It is clear from the studies which were undertaken that Basin Commission's conclusions were the result of a rigorous and independent examination of the project. There is nothing in the EIS to indicate that the "actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." *Calvert Cliffs' Coordinating Committee, supra* at 1115. These conclusions will not be disturbed.

### (b) *Cost-Benefit Analysis*

Plaintiffs contend that only by performing a cost-benefit analysis could "unquantified environmental amenities" have been given the appropriate consideration required by NEPA and that the failure to undertake such an analysis precluded complete assessment of the project.[19]

The cost-benefit analysis is an economic tool that has been used by federal agencies to justify public expenditures on government projects. Basically a cost-benefit analysis is a "comparison of anticipated 'benefits' derived from a particular public works project with the anticipated 'costs' over the estimated life span of the project." *Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1362 (S.D. Tex.1973), *rev'd on other grounds sub nom., Sierra Club v. Callaway,* 499 F.2d

982 (5th Cir. 1974). The analysis subjectively determines which anticipated effects of the project constitute a "cost" and which constitute a "benefit" to society and then attempts to place a market value on these effects. Only those projects which promise to yield an economic return in excess of society's expenditures or "costs" are carried out.

Where public projects are concerned, there is a split of authority as to whether NEPA requirements for an EIS can be fulfilled without a cost-benefit analysis. See *Environmental Defense Fund, Inc. v. Armstrong,* 352 F.Supp. 50, 57 (N.D.Cal.1972), *aff'd,* 487 F.2d 814 (9th Cir. 1973), *cert. denied,* 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir. 1974); *Warm Springs Task Force v. Gribble,* 378 F. Supp. 240, 247 (N.D.Cal.1974); *Natural Resources Defense Council, Inc. v. Stamm,* 6 ERC 1525, 1528 (E.D.Cal. 1974); see also *Sierra Club v. Stamm,* 6 ERC 1848, 1853 (C.D.Utah 1974); and *Burleigh v. Callaway,* 362 F.Supp. 121, 123 (D.Hawaii 1973). Compare *Duck River Preservation Ass'n v. Tennessee Valley Authority,* 6 ERC 1789, 1793 (E. D.Tenn.1974); *Environmental Defense Fund v. Tennessee Valley Authority,* 371 F.Supp. 1004, 1010–11 (E.D.Tenn.1973), *aff'd,* 492 F.2d 466 (6th Cir. 1974); *Environmental Defense Fund, Inc. v. Froehlke,* 368 F.Supp. 231, 240–41 (W. D.Mo.1973), *aff'd sub nom., Environmental Defense Fund, Inc. v. Callaway,* 497 F.2d 1340 (8th Cir. 1974); *Montgomery v. Ellis,* 364 F.Supp. 517, 521 (N.D.Ala.1973); *Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1366 (S.D. Tex.1973), *rev'd on other grounds sub nom., Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974); *Cape Henry Bird*

---

19. Section 102 (42 U.S.C. § 4332), provides in part:

"The Congress authorizes and directs that, to the fullest extent possible:

\*　　\*　　\*　　\*　　\*

(2) all agencies of the Federal Government shall—

\*　　\*　　\*　　\*　　\*

(B) identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations."

*Club v. Laird,* 359 F.Supp. 404, 414 (W. D.Va.1973), *aff'd,* 484 F.2d 453 (4th Cir. 1973). See also *Natural Resources Defense Council, Inc. v. Morton,* 148 U. S.App.D.C. 5, 458 F.2d ·827, 834 (1972) ; *Daly v. Volpe,* 350 F.Supp. 252, 259 (W. D.Wash.1972), and *Lathan v. Volpe,* 350 F.Supp. 262, 266 (W.D.Wash.1972).

██ This case does not involve a publicly funded project. The pipeline represents a private investment by Interstate. Plaintiffs have cited no case, and I have found none, requiring a cost-benefit analysis where a privately funded project is involved. As noted above, environmental amenities were given "appropriate consideration" in the decisionmaking process. Pursuant to § 102(2)(B) (42 U.S.C. § 4332(2)(B)), the EIS isolated, identified, and evaluated, among other factors, the probable environmental impacts of the project on the natural, man-made, human and economic resources of the area.[20] NEPA requires no more. Basin Commission's review of Interstate's application was sufficiently complete to comport with all NEPA requirements.

#### B. *Adversary Hearings*

Plaintiffs assert that Basin Commission disregarded the requirements of NEPA and §§ 2–3.10 and 2–3.11 of its own Rules of Practice and Procedure when it denied their request for an adversary hearing and further, that Basin Commission violated § 102(2)(C) (42 U.S.C. § 4332(2)(C)) of NEPA since all hearings had been held prior to the completion of the final EIS.

██ I can find no language in NEPA mandating an adversary hearing. See *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir. 1973); *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). The advisability of public hearings is discussed in the Council on Environmental Quality Guidelines adopted pursuant to NEPA. However, such hearings are left to agency discretion:

"(d) Agency procedures . . . should indicate as explicitly as possible those types of agency decisions or actions which utilize hearings as part of the normal agency review process, either as a result of statutory requirement or agency practice. To the fullest extent possible, all such hearings shall include consideration of the environmental aspects of the proposed action. Agency procedures shall also specifically include provision for public hearings on major actions with environmental impact, *whenever appropriate,* and for providing the public with relevant information, including information on alternative courses of action. In deciding whether a public hearing is appropriate, an agency should consider: (1) The magnitude of the proposal . . . ; (2) the degree of interest in the proposal . . . ; (3) the complexity of the issue . . . ; and (4) the extent to which public involvement already has been achieved through other means, such as *earlier public hearings, meetings* with citizen representatives, and/or *written* comments on the proposed action. . . ." 40 C.F.R. § 1500.7(d) (1973). (Emphasis added).

Thus, although it requires full environmental disclosure and review, NEPA allows the agency to apply its own internal rules to decide when public hearings are "appropriate." In certain circumstances Basin Commission's procedures compel a hearing, for example, the Delaware River Basin Compact (§ 13.1) requires that Basin Commission conduct a public hearing prior to any revision of the Delaware River Basin Comprehensive Plan. Basin Commission hearings of June 28, 1973 and February 26, 1974, satisfied this requirement.

On the other hand, §§ 2–3.10, 2–3.11 of the Rules of Practice and Procedure give the Executive Director discretion to

---

20. See EIS pp. EE–1 to EE–72, and pp. I–1 to I–33.

determine whether or not objections to a project are sufficiently substantial to warrant an adversary hearing. In this case, after considering plaintiffs' request, the Executive Director determined that an adversary hearing was not "appropriate." His reasons for concluding that further hearings would not aid the reviewing process were set forth in a letter to plaintiffs' counsel:[21]

"* * *

The Interstate Energy pipeline application has had, in addition to the regular public hearing, two informational hearings. . . .

There have been three detailed EISs prepared by DRBC covering all aspects of the issue at hand. Each went to the adversaries, requesting comment. Each had public hearings. In each instance the EIS process has taken one year or longer to complete, allowing a total of more than 18 months for public involvement. In each instance public announcements were sent to all identified concerned parties. A fourth EIS is also involved— the Buckeye pipeline EIS prepared by the Corps of Engineers. It has also completed the full process required by law.

* * * * * *

Insofar as the present state of the art and the Commission's jurisdiction permit, I find [these] Environmental Impact Statements . . . adequately disclose the environmental factors and their evaluation for these projects separately considered and for their combined consideration and evaluation.

. . . I find that the requirements of NEPA, that the Commission strike a reasonable balance of costs and benefits in good faith, giving due weight to environmental values, may be soundly based upon the EISs which have been prepared with full public participation.[22]

* * * *"

■ Basin Commission participated in three public hearings in which the plaintiffs also actively participated. It solicited and discussed plaintiffs' comments and included them in the final EIS,[23] considered four impact statements and reviewed 2,000 pages of PUC hearings on the subject. This inquiry demonstrates that Basin Commission took a "hard look" at the consequences of the proposed pipeline, thereby enabling sufficient information to be gathered "to permit a reasoned choice of alternatives so far as environmental aspects are concerned."[24] *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). Also see *Sierra Club v. Froehlke*, 345 F.Supp. 440 (W.D.Wis. 1972), aff'd, 486 F.2d 946 (7th Cir. 1973). As stated in *Hanly v. Kleindienst*, 471 F.2d 823, 836 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973):

"The precise procedural steps to be adopted are better left to the agency, which should be in a better position

21. See Basin Commission's Exhibit B, letter from James F. Wright to the late Donald L. Hemphill, Esquire.

22. The Impact Statements referred to and considered had been prepared earlier for the Gilbert and Martins Creek Generating Stations and for the Buckeye pipeline—a pre-existing pipeline mentioned as an alternative to Interstate's proposal.

23. STOPS's comments concerning Basin Commission's hearings and the draft EIS are printed in the Final EIS on pp. CR 37, 38; CR 52–58; CR 59–64; CR 73; as well as in a letter from Mary Rogers, President of STOPS dated March 1, 1974, located in the section entitled "Copies of Written Comments on Draft Environmental Impact Statement."

24. Plaintiffs' demand for a hearing is based on their claim that they have raised "substantial" issues concerning (1) alternate means of oil transport; (2) alternate pipeline routes; and (3) use of existing pipelines. Basin Commission had already researched these possibilities and evaluated them. See EIS, Section "Alternatives to Proposed Action."

than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data."

Also see *Jicarilla Apache Tribe of Indians v. Morton, supra.* On the record presented, I find that Basin Commission complied with NEPA and with its own rules and that it did not act arbitrarily or abuse its discretion by failing to hold an adversary hearing.

Plaintiffs attempt a further attack on Basin Commission's hearing process by contending that the public hearings of April 16, 1973, June 28, 1973 and February 26, 1974, preceded the completion of the final EIS (June 28, 1974), thereby violating § 102(2)(C) (42 U.S.C. § 4332(2)(C)) of NEPA which states that "such statement . . . shall accompany the proposal through the existing agency review processes."

The Supreme Court in *Aberdeen and Rockfish R. R. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), directly resolved this question. The lower court in *Aberdeen and Rockfish R. R., supra*, citing § 102(2)(C) (42 U.S.C. § 4332(2) (C)), had ruled that the Interstate Commerce Commission should have completed its final EIS in time for an oral hearing at which plaintiffs' proposal for increased rail rates was considered. The Supreme Court expressly rejected this interpretation:

"This sentence does not, contrary to the District Court opinion, affect the time when the 'statement' must be prepared. It simply says what must be done with the 'statement' once it is prepared—it must accompany the 'proposal.' " *Id.* at 320, 95 S.Ct. at 2356.

The Court noted that the "statement" referred to was the final EIS and went on to hold:

"[T]he time at which the agency must prepare the final 'statement' is the time at which it makes a recommendation or report on a *proposal* for federal action." *Id.* at 320, 95 S.Ct. at 2356 (Emphasis in original)

The Court then distinguished the situation in which the agency itself institutes a proposal from one in which the agency undertakes the study of an applicant's proposal:

"Where an agency initiates federal action by publishing a proposal and then holding hearings on the proposal, the statute would appear to require an impact statement to be included in the proposal and to be considered at the hearing. Here, however, until the [Interstate Commerce Commission's] report, the ICC had made no proposal, recommendation or report. The only proposal was the proposed new rates filed by the railroads. Thus, the earliest time at which the statute required a statement was the time of the ICC's report . . . sometime after the oral hearing." *Id.* at 320, 95 S.Ct. at 2356 (Footnote omitted)

Similarly, Basin Commission advanced no proposal of its own until September 25, 1974, when it approved the pipeline for inclusion in the Comprehensive Plan for the Delaware River Basin:

"The project does not conflict with nor adversely affect the Comprehensive Plan. It is financially and physically feasible, conforms to accepted public policy, and does not adversely influence the present or future use and development of the water resources of the Basin."[25]

Such approval, coming more than two months after the final EIS has been re-

25. See Notice of Commission Action September 27, 1974, Docket No. D–71–109 CP, Sheet 4.

leased (June 28, 1974) is in keeping with the Supreme Court's analysis of § 102(2)(C) (42 U.S.C. § 4332(2)(C)) in *Aberdeen and Rockfish R. R., supra,* concerning the preparation of the final EIS.

Prior to this action, Basin Commission had performed a reviewing function only:

"The Commission maintains a comprehensive water resources plan for the Delaware River Basin and reviews water resources projects proposed by other public and private agencies. Review of projects enables the Commission to prevent conflicts among water users and to protect the integrity of the Comprehensive Plan."[26]

The record amply demonstrates that environmental considerations pervaded every aspect of this review. The hearings, the solicitation of comments, the circulation of Interstate's environmental report and the draft EIS, and the completion of the final EIS were all directed to providing the Basin Commission with as much information concerning the environmental impacts of the project as possible. It was only after all such data had been compiled that Basin Commission approved Interstate's proposal. Such a review process does not violate NEPA's policy of environmental protection.

Thus, for the reasons cited above, I can find nothing in the record to indicate that Basin Commission's regulations or procedures were unconstitutional or violative of plaintiffs' civil rights.

---

26. See footnote 25, Explanatory Note.